RAWLS TRADING, L.P., RAWLS MANAGEMENT CORPORATION,
TAX MATTERS PARTNER, ET AL.,[1] PETITIONERS
*v*. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos.  12937–07, 12938–07,    Filed March 26, 2012.
14880–07.

R simultaneously issued notices of final partnership administrative adjustment (FPAAs) to two lower tier or "source" partnerships and one upper tier or "interim" partnership. The FPAA issued to the interim partnership purports to give effect only to the adjustments shown on the FPAAs issued to the source partnerships. Ps petitioned the Court challenging all three FPAAs, and the three partnership proceedings were consolidated. R subsequently asked to stay the

[1] Cases of the following petitioners are consolidated herewith: Rawls Family, L.P., Rawls Management Corporation, Tax Matters Partner, docket No. 12938–07; and Rawls Group, L.P., Rawls Family, L.P., Rawls Management Corporation, Jerry Rawls and the Jerry S. Rawls Business Trust, Jerry Rawls, Trustee, Partners Other Than the Tax Matters Partner, docket No. 14880–07.

proceeding for the interim partnership, conceding that the underlying FPAA was issued prematurely but asserting that the FPAA is nonetheless valid and properly confers jurisdiction on the Court. *Held*: Under the analysis and reasoning articulated in *GAF Corp. & Subs. v. Commissioner*, 114 T.C. 519 (2000), as applied to a tiered partnership structure, the FPAA issued to the interim partnership, which represents only the impact of the adjustments shown on the FPAAs issued to the two source partnerships and which was issued before the completion of the two source partnership proceedings, is invalid and does not confer jurisdiction on the Court. Therefore, the Court will, on its own motion, dismiss the interim partnership proceeding for lack of jurisdiction.

*Michael Todd Welty*, *David E. Colmenero*, and *Laura L. Gavioli*, for petitioners.

*Josh O. Ungerman*, for petitioners in docket No. 14880–07.

*Elaine H. Harris*, *David B. Flassing*, *Julie Ann P. Gasper*, and *Mark Edward O'Leary*, for respondent.

VASQUEZ, *Judge*: These three consolidated cases are before the Court on respondent's request to stay the proceeding in one case. The cases constitute partnership-level proceedings under the unified partnership audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97–248, sec. 402(a), 96 Stat. at 648 (codified as amended at sections 6221–6233).[2]

Once each during two discrete periods, the first spanning late March through early April 2000 and the other covering early August through early September 2000, Jerry S. Rawls engaged in the short sale variant of the "Son-of-BOSS" tax shelter,[3] employing several newly formed entities. These included: Rawls Family, L.P. (Family), Rawls Group, L.P. (Group), and Rawls Trading, L.P. (Trading), each of which sought to be characterized as a partnership for tax purposes.[4] As more fully discussed below, these purported part-

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the tax year at issue, 2000, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] *See Kligfeld Holdings v. Commissioner*, 128 T.C. 192 (2007) (providing a detailed description of the shelter).

[4] Where applicable, and for narrative convenience only, we adopt some of the terms that Mr. Rawls and others associated with these entities had used to describe the transactions at issue. Such terms include "partner(s)", "partnership", and "L.P." Our use of any of these terms does not constitute, and should not be construed as, a finding that the legal status or relationship conveyed by that term in fact existed at the relevant time.

nerships were arranged in a "tiered" structure, with Family holding ownership interests in Group and Trading.

Group and Trading were the entities in which the "sheltering" transactions, which allegedly subsequently generated losses, originated. Because Group and Trading were the source of the putative losses, we refer to them as the "source" partnerships. The claimed losses resulted from transactions overstating the bases of partnership interests in the source partnerships. These overstated bases supposedly flowed through to Family, which used them to "fabricate" losses. These contrived losses eventually inured to Mr. Rawls' tax benefit through other passthrough entities. Because it was interposed between the source partnerships, on the one hand, and Mr. Rawls, on the other, we refer to Family as the "interim" partnership.

Using this pyramid-like partnership structure, in which overstated bases purportedly achieved in the source partnerships tiered up through the interim partnership to his benefit, Mr. Rawls claimed tax savings of approximately $11 million.[5] Respondent, by means of notices of final partnership administrative adjustment (FPAAs) issued to Family, Group, and Trading, disallowed the losses at the respective partnership level and asserted accuracy-related penalties under section 6662(a) and (h).[6] The tax matters partners (TMPs) of Family and Trading and a participating partner of Group brought these consolidated actions on behalf of their respective entities.

After having issued the FPAAs, respondent now contends, in effect, that the FPAA to Family was premature. Respondent has asked the Court to stay the proceeding with respect to Family until the partnership-level proceedings for Group and Trading have been resolved. The issues that we decide here are: (1) whether the Family FPAA is valid and properly confers jurisdiction on us over the Family case; and

---

[5] This figure represents the taxes that would otherwise have been owing on the long-term capital gains claimed to have been sheltered by the alleged losses. As mentioned *infra* Findings of Fact, pt. II.A., Mr. Rawls arranged a sale of shares of common stock that he had held for several years in a company which was subsequently publicly listed and traded, at the interim partnership level. The net proceeds of this sale amounted to $61,052,041.70. Because Mr. Rawls had a negligible basis in these shares, almost the total net proceeds would have constituted long-term capital gains and been subject to a 20% tax rate. We note that Mr. Rawls' personal income taxes are not at issue in these partnership-level proceedings.

[6] On March 17, 2009, the Court granted petitioners' motion to consolidate the cases for trial, briefing, and opinion.

(2) if we have jurisdiction, whether we should grant respondent's motion and stay proceedings in the Family case until we have entered our decisions in the Group and Trading cases and our decisions have become "final" within the meaning of section 7481(a)(2)(A).

FINDINGS OF FACT

I. *Jerry S. Rawls*

Mr. Rawls earned a bachelor of science degree in mechanical engineering from Texas Tech University and a master of science degree in industrial administration from Purdue University. From 1968 through 1988 he worked for Raychem Corp., where he began as a sales engineer and eventually rose to general manager of two divisions within the company.

Mr. Rawls cofounded the fiber optics company Finisar Corp. (Finisar) in 1989. Upon formation of Finisar, Mr. Rawls received a portion of its outstanding shares of common stock. Since the company's inception, Mr. Rawls has served, variously, as Finisar's president, chief executive officer, or chairman of the board.

By 1999 Finisar had become the nation's leading provider of fiber optic subsystems and network performance tests. On November 11, 1999, Finisar announced an initial public offering (IPO) of its common stock. On November 17, 1999, Finisar made an IPO of 8,150,000 shares. At the time of the IPO, Mr. Rawls owned 8,470,627 shares of Finisar stock, which represented 20.2% of Finisar's outstanding common stock.[7] However, because of his position at the company, Mr. Rawls was subject to a "lock up" that precluded him from selling his Finisar shares in the IPO and for a six-month period thereafter.

Around the time of the IPO, Mr. Rawls had no personal will or estate plan in place, he had no personal lawyers, and his Finisar holdings made up substantially all of his net worth. Between February and March 2000, Mr. Rawls was busy traveling the country in advance of an upcoming secondary offering of Finisar's common stock, scheduled for later that spring. Mr. Rawls intended to sell approximately 600,000

---

[7] Mr. Rawls' stock ownership in Finisar represented approximately 28% of the company's outstanding common stock before the IPO.

shares of his Finisar common stock in this secondary offering.

## II. *The Transactions*

On December 8, 1999, Steven J. Lange, a representative from the Heritage Organization, L.L.C. (Heritage),[8] made an unsolicited call to Mr. Rawls to discuss Heritage's services. According to Mr. Lange's summary of that call, he explained to Mr. Rawls that Heritage does "work in capital gains for large capital gains, actually eliminating the capital gains taxes and [they] do estate planning, dropping estate taxes down to 15[%]". Mr. Rawls agreed to meet with a Heritage representative in person. Mr. Rawls met with various Heritage representatives several times between December 1999 and early 2000.

Heritage referred Mr. Rawls to Lewis, Rice, Fingerlish (Lewis Rice), a law firm to which Heritage had previously referred five clients in the preceding two years. Mr. Rawls paid Lewis Rice a fee of $150,000 for its services, which included a written tax opinion for the transactions relating to Trading.[9]

During March and early April 2000, Heritage and Mr. Rawls discussed strategies aimed at significantly reducing capital gains taxes that he would owe on any future sale of his Finisar stock. Initially, Heritage and Mr. Rawls contemplated a strategy seeking to "inflate", or overstate, the basis of Mr. Rawls' Finisar stock before its sale.

The strategy envisaged entering into a short sale of Treasury notes and transferring the proceeds of the short sale (along with the obligation to close the short sale) to a partnership. The desired tax result was an inflated "outside basis" in the partnership.[10] The idea was to "impute" this

---

[8] Heritage filed a voluntary petition for relief under ch. 11 of the Bankruptcy Code on May 17, 2004. *See In re Heritage Org., L.L.C.*, 375 B.R. 230, 238–242 (Bankr. N.D. Tex. 2007) (discussing Heritage's activities and its relationship with its clients, as conducted before the filing of the bankruptcy petition).

[9] In addition, on or around May 5, 2000, Mr. Rawls effectively paid a fee of $4,472,062 to Heritage for its services. The fee was arranged through the Jerry S. Rawls Business Trust (ESBT). Mr. Rawls was the sole grantor, trustee, and beneficiary of ESBT. *See infra* pt. II.A.

[10] Outside basis refers to the basis of a partner's partnership interest. *See generally* sec. 722 (providing that the basis of a partner's partnership interest acquired by the contribution of property other than money is the basis of the contributed property; and the basis of a partner's partnership interest acquired by the contribution of money is the amount of money contributed); sec. 752(a) (providing that the basis of a partner's partnership interest is increased to the extent

Continued

inflated outside basis to Mr. Rawls' Finisar stock before it was sold. To achieve this, Mr. Rawls would have previously arranged for a contribution of his Finisar stock to the partnership. This stock would then have been received back in a liquidating distribution from the partnership. Presumably, it would have been claimed, under authority of section 732(b), that the Finisar stock was being received back with a basis equal to the inflated outside basis in the partnership.

However, this strategy for inflating the basis of Finisar stock before its sale was subsequently discarded in favor of a more complex strategy involving two partnerships. It was envisaged that the two partnerships would eventually be arranged in a tiered structure, with one almost entirely owned by the other. The objective of this strategy was to "manufacture" a short-term capital loss in the upper tier partnership. The loss would then be proclaimed to be available to offset capital gains that the upper tier partnership would realize by selling Finisar stock, previously contributed to it.

Engineering the short-term capital loss contemplated, in the first instance, inflating the outside basis of a partnership—the partnership that would become the lower tier partnership. The notion was to impute this inflated outside basis to the assets of another partnership—the partnership that would become the upper tier partnership. As a consequence of the tiered partnership structure, the erstwhile inflated outside basis in the lower tier partnership would become the overstated "inside basis" of assets held by the upper tier partnership. [11] These assets would comprise substantially all of the partnership interests in the lower tier partnership.

of the partner's increased share of partnership liabilities); sec. 752(b) (providing that the basis of a partner's partnership interest is decreased to the extent of the partner's decreased share of partnership liabilities); sec. 705 (providing rules for subsequent adjustments to the basis of a partner's partnership interest, following its initial determination at the time of original acquisition, to reflect the partnership's operating results and the partner's distributive shares of partnership income, gain, loss, deduction, and credit); sec. 733 (providing rules for adjustments to the basis of a partner's partnership interest to account for distributions from the partnership to the partner).

[11] Inside basis refers to the partnership's basis in partnership property. *See generally* sec. 723 (providing that the basis of property contributed to a partnership by a partner shall be the adjusted basis of such property to the contributing partner at the time of contribution, increased by the amount of any gain recognized at contribution); sec. 734 (providing rules for the adjustment of basis in partnership property to account for distributions if the partnership has made an election under sec. 754); sec. 743 (providing rules for the adjustment of basis in partnership property to account for transfers of partnership interest if the partnership has made an election under sec. 754).

The upper tier partnership would subsequently sell these partnership interests, at a price reflecting their true economic value rather than their overstated basis. A short-term capital loss would allegedly be realized as a result of this sale.

As would have been the case in the discarded strategy for inflating the basis of Finisar stock, inflating the outside basis in the lower tier partnership would be achieved by entering into a short sale of Treasury notes. The proceeds of the short sale (along with the obligation to close the short sale) would be transferred to the lower tier partnership. The tiered partnership structure itself would be effected by a purported capital contribution of substantially all of the partnership interests in the lower tier partnership to the upper tier partnership. Following this capital contribution, the upper tier partnership would hold, as assets, almost all of the partnership interests in the lower tier partnership. The upper tier partnership would claim, under authority of section 723, that its basis in these assets is the same as the inflated outside basis in the lower tier partnership at the time of the capital contribution.

As discussed below, Mr. Rawls ended up executing the tiered partnership strategy twice; once during March and April 2000, and then again during August and September 2000. A different lower tier partnership was involved each time. However, Mr. Rawls used the same upper tier partnership on both occasions.

For purposes of resolving the jurisdictional question at hand, the proper tax characterization of each step of every transaction at issue is not necessarily critical. Instead, what matters is whether the lower tier partnerships were indeed the source of the asserted overstatement of their respective outside bases and whether the upper tier partnership was merely a conduit. Consequently, we omit, for now, many of the exact details of these extremely elaborate transactions and provide only a cursory overview, finding only such facts as bear upon the inquiry into whether we have jurisdiction over the interim partnership proceeding.

A. *The Group Transactions*

The tiered partnership strategy was first implemented with a series of transactions that took place between March 28 and April 10, 2000, in roughly the order in which they are described below.

Mr. Rawls formed four entities: the Jerry S. Rawls Management Corp. (JSRMC); Rawls Management Corp. (RMC); the Jerry S. Rawls Business Trust (ESBT); and the Jerry S. Rawls Family Trust (Family Trust). [12] Mr. Rawls was the sole shareholder, president, and director of JSRMC and RMC and the grantor, trustee, and beneficiary of ESBT. Mr. Rawls contributed 1,060,000 shares of Finisar stock to ESBT. Mr. Rawls and his brother, Warren Rawls, were the grantor and trustee, respectively, of Family Trust. Family Trust's beneficiaries are the descendants of Mr. Rawls' parents, with the exception of Mr. Rawls.

ESBT and RMC formed Family, which would serve as the upper tier partnership. Mr. Rawls, as trustee of ESBT, was a 99.99% limited partner in Family, and RMC was a 0.01% general partner, and the sole general partner, of Family. Mr. Rawls contributed his interest in RMC to ESBT. ESBT contributed the 1,060,000 shares of Finisar to Family.

ESBT, through a brokerage account at Paine Webber, sold short Treasury notes with a face value of $200 million, receiving $201,326,876 in proceeds. JSRMC and ESBT formed Group, which would serve as the lower tier partnership. ESBT received a 99.99% limited partnership interest in Group in exchange for a contribution of the proceeds of the short sale and the obligation to close the short sale.

On its Form 1065, U.S. Return of Partnership Income (partnership return), for the short tax year beginning April 2 and ending April 6, 2000, filed February 18, 2001, Group accounted for the short sale proceeds as ESBT's capital contribution. Group did not account for the obligation to close the short sale as a partnership liability under section 752(a) and (b). Thus, ESBT presumably received an inflated outside

---

[12] JSRMC and RMC each filed a Form 2553, Election by a Small Business Corporation. Respondent issued notices of acceptance as S corporations to JSRMC and RMC. Mr. Rawls filed an election for ESBT to be a small business trust under sec. 1361(e)(3). Respondent claims that Heritage employed an electing small business trust in its strategies to avoid having a claimed loss appear on an individual customer's tax return. According to respondent, this minimized the likelihood that the claimed loss would be detected and challenged.

basis in Group. JSRMC received a 0.01% general partnership interest in Group in exchange for a nominal contribution and became the sole general partner of Group.

ESBT then contributed its partnership interest in Group to Family. Family, presumably under authority of section 723, inherited ESBT's inflated outside basis. The ownership structure at this stage is set forth in the diagram below.



JSRMC and Family then sold their respective partnership interests in Group to Family Trust.[13] Following this sale, all ownership interests in Group were held by Family Trust. Group, now presumably a "single member disregarded entity",[14] continued to remain liable for the obligation to close the short sale.

On its partnership return for the short tax year beginning March 29 and ending December 31, 2000, filed October 16,

---

[13] Mr. Rawls subsequently sold his interest in JSRMC to Heritage.

[14] *See* secs. 301.7701–1(a)(4) (providing that "certain organizations that have a single owner can choose to be recognized or disregarded as entities separate from their owners"), 301.7701–3(b)(1)(ii) (providing that a domestic entity is "[d]isregarded as an entity separate from its owner if it has a single owner."), Proced. & Admin. Regs.

2001, Family claimed a loss of $202,418,954 on the sale of its partnership interest in Group to Family Trust. Almost the entire amount of this loss was the result of the overstatement of Family's basis in its partnership interest in Group. This overstatement, in turn, arose from Group's failure to account for the obligation to close the short sale.

Family sold 635,297 of the 1,060,000 shares of Finisar stock that had been previously contributed to it in a secondary offering, generating net proceeds of $61,052,041.70 after a 3.9% commission. Family Trust then closed the short sale of the Treasury notes.

Lewis Rice prepared all the documents in connection with the Group transactions. However, Lewis Rice refused to issue a "more-likely-than-not" opinion letter for the desired tax consequences. Lewis Rice believed that there was a greater-than-50% likelihood that the short-term loss claimed by Family on the sale of its partnership interest in Group would be disallowed under section 267. Specifically, the concern appears to have been that Family and Family Trust would be deemed "related" within the meaning of section 267.

After discussions between Mr. Rawls and representatives from Heritage and Lewis Rice, it was decided to undertake a second set of transactions during August and September 2000. These transactions replicated the Group transactions described above in a new lower tier partnership.[15] To avoid section 267 concerns, it was arranged that the partnership interests in this new lower tier partnership would be sold to a "bona fide" third party—an entity organized by Heritage specifically for this purpose.

B. *The Trading Transactions*

The transaction with a new lower tier partnership took place in roughly the order in which they are described below. ESBT began by contributing 5,461,679 shares of Finisar stock, previously transferred from Mr. Rawls, to Family.[16] ESBT, through a brokerage account at Donaldson, Lufkin & Jenrette, sold short Treasury notes with a face value of $200

---

[15] Also, RMC was used as the 0.01% general partner of the new lower tier partnership. Mr. Rawls had previously sold his interest in JSRMC to Heritage, as part of the Group transactions. *See supra* note 13.

[16] The number of contributed Finisar shares represented a 3-for-1 stock split that had taken effect after the Group transactions had been completed.

million, receiving $200,449,728 in proceeds. ESBT and RMC formed Rawls Trading, L.P. (Trading), which would serve as the new lower tier partnership. ESBT received a 99.99% limited partnership interest in Trading in exchange for a contribution of the proceeds of the short sale and the obligation to close the short sale.

On its partnership return for the short tax year beginning August 17 and ending September 7, 2000, filed July 17, 2001, Trading accounted for the short sale proceeds as ESBT's capital contribution. Trading did not account for the obligation to close the short sale as a partnership liability under section 752(a) and (b). Thus, ESBT presumably received an inflated outside basis in Trading. RMC received a 0.01% general partnership interest in Trading in exchange for a nominal contribution and became the sole general partner of Trading.

ESBT then contributed its partnership interest in Trading to Family. Family, presumably under authority of section 723, inherited ESBT's inflated outside basis. The ownership structure at this stage is set forth in the diagram below.



RMC and Family sold their respective partnership interests in Trading to the West Coast Business Trust (West Coast). West Coast's sole trustee was Gary M. Kornman, a "key" principal at Heritage, and the individual who ostensibly controlled Heritage. West Coast was evidently set up for the sole purpose of accommodating the sale of partnership interests in Trading. Following this sale, all ownership interests in Trading were held by West Coast. Trading, now presumably a "single member disregarded entity",[17] continued to remain liable for the obligation to close the short sale.

On its partnership return, Family claimed a loss of $201,951,603 on the sale of its partnership interest in Trading to West Coast. Almost the entire amount of this loss was the result of the overstatement of Family's basis in its partnership interest in Trading. This overstatement, in turn, arose from Trading's failure to account for the obligation to close the short sale. West Coast presumably closed the short sale of the Treasury notes.

It is readily apparent from the foregoing description of the Group and Trading transactions that Group and Trading were, in fact, the source partnerships in which the overstatement of bases was engineered. By comparison, Family was the partnership that merely transmitted the consequences of these overstated bases to Mr. Rawls through other pass-through entities, viz, ESBT, RMC, and JSRMC. As mentioned below, respondent admits as much, and in so many words.[18] Consequently, each of Group and Trading is properly characterized as a source partnership, while Family is properly designated an interim partnership.

III. *Reporting the Transactions*

On October 16, 2000, Lewis Rice issued a written tax opinion to Mr. Rawls supporting the short-term capital loss claimed on Family's partnership return on account of the Trading transactions. Mr. Rawls hired Larry Poster, a certified public accountant, to prepare the tax returns for ESBT, Family Trust, Family, Group, and Trading. Mr. Poster was referred to Mr. Rawls by Heritage. Mr. Poster had previously worked on at least one other transaction with a Heritage

---

[17] *See supra* note 14 (citing the applicable regulations defining a "single member disregarded entity").

[18] *See infra* note 19 and accompanying text.

client, but had never previously received referral fees from or had a fee arrangement with Heritage. Mr. Poster characterized the Rawls transaction as involving the "generation of losses to offset other gains".

Mr. Poster reviewed and agreed with the Lewis Rice opinion. He advised Mr. Rawls that the short sale obligation was not a liability for purposes of section 752. He also advised Mr. Rawls that it was appropriate to report the Group losses on the Family return. Mr. Poster felt it was proper to report the losses from both transactions despite the lack of an opinion letter for the April transaction. Mr. Poster charged Mr. Rawls $3,000 to $5,000 per return prepared.

As of the date of trial Mr. Rawls continued to control Family. At that time Family's assets included shares of stock in Finisar and other companies, bonds, and private equity, mutual fund, and hedge fund holdings exceeding $67 million in value. Also, as of the date of trial Mr. Poster continued to prepare tax returns for Mr. Rawls and entities that he owned.

As mentioned above, the Family, Group, and Trading partnership returns were filed on October 16, February 18, and July 17, 2001, respectively.

## IV. *Issuance of the FPAAs*

On March 9, 2007, respondent timely mailed to the respective TMPs of Trading, Group, and Family FPAAs of the partnership items of Trading for the short tax year ending September 7, 2000 (Trading FPAA), Group for the short tax year ending April 6, 2000 (Group FPAA), and Family for the tax year 2000 (Family FPAA). On June 6, 2007, Trading's TMP, RMC, timely filed a petition for redetermination of the partnership items of Trading as set forth in the Trading FPAA. On June 6, 2007, RMC filed a timely petition under section 6226(a) for redetermination of the partnership items of Family as set forth in the Family FPAA. On July 2, 2007, a petition for redetermination of the partnership items of Group as set forth in the Group FPAA was filed.

On September 24, 2008, respondent filed a motion to stay the partner-level proceedings initiated in response to the Family FPAA. We denied respondent's motion without prejudice in an order of January 27, 2009. Respondent now raises

the issue for the second time on brief and adopts the same arguments contained in his motion.

OPINION

I. *We Are Obliged To Determine Whether We Have Jurisdiction.*

Neither party has questioned our jurisdiction over the Family case or disputed the validity of the Family FPAA. Respondent insists that the Family FPAA is valid and merely asks us to stay the Family case until the resolution of the Group and Trading cases. *See* motion to stay 1–2 ("Having issued a *valid*, but partially premature, FPAA to Family's partners for 2000, respondent requests the case be stayed pending the outcome of the related source partnership proceedings." (Emphasis supplied.)). Petitioners object to a stay and wish for a concurrent resolution of all three consolidated cases.

Regardless of the parties' seeming acquiescence on the validity of the Family FPAA, we are under an affirmative duty to investigate the extent of our subject matter jurisdiction. *See, e.g.*, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (underlining that courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party"); *United States v. Cotton*, 535 U.S. 625, 630 (2002) (holding that "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived").

We are a court of limited jurisdiction, and our jurisdiction is both granted and circumscribed by statute. *See* sec. 7442 ("The Tax Court and its divisions shall have such jurisdiction as is conferred on them by this title"); *see also Pyo v. Commissioner*, 83 T.C. 626, 632 (1984) ("This Court is a court of limited authority and may exercise jurisdiction only to the extent expressly provided by Congress."). Section 6226(a) confers jurisdiction on us over a timely filed "petition for a readjustment of the partnership items" that the Commissioner had previously adjusted pursuant to a valid FPAA. Section 6223 requires the Commissioner to "mail to each partner whose name and address is furnished to * * * [him] notice[s] of * * * the beginning of an administrative proceeding at the partnership level with respect to a partnership item, and

* * * the final partnership administrative adjustment resulting from any such proceeding."

As mentioned above, respondent had mailed the Family FPAA on March 9, 2007, and in response RMC had timely petitioned the Court on June 6, 2007. Prima facie, we would appear to have jurisdiction to readjust the items that respondent had adjusted in the Family FPAA. This presumes, however, that none of the adjustments shown on the Family FPAA constitutes a "computational adjustment" within the meaning of section 6231(a)(6). If, however, the Family FPAA merely reflects computational adjustments, then, as we show below, the issuance of this FPAA before the conclusion of the partnership-level proceedings for Group and Trading would render the FPAA ineffective for conferring jurisdiction upon us.

## II. *Adjustments on the Family FPAA Are Computational Adjustments*.

Section 6231(a)(6) defines computational adjustment as "the change in the tax liability of a partner which properly reflects the treatment * * * of a partnership item." It adds that "All adjustments required to apply the results of a proceeding with respect to a partnership * * * to an indirect partner shall be treated as computational adjustments."

Section 6231(a)(10) defines an indirect partner as "a person holding an interest in a partnership through 1 or more pass-thru partners." A "pass-thru" partner, in turn, is defined by section 6231(a)(9) as "a partnership * * * or other similar person through whom other persons hold an interest in the partnership with respect to which proceedings under this subchapter are conducted."

Mr. Rawls was an indirect partner in each of Group and Trading because he held interests in both these entities through Family and other "pass-thru partner[s]" within the meaning of section 6231(a)(9). Therefore, to the extent the Family FPAA was merely seeking to apply to Mr. Rawls' individual tax liability the results of the adjustments shown on the Group FPAA and Trading FPAA, pursuant to section 6231(a)(6), the Family FPAA was only making computational adjustments.

Respondent admits that all adjustments shown on the Family FPAA reflect the consequences of corresponding adjustments shown on the Group FPAA and Trading FPAA.[19] Thus, to the extent the Family FPAA made any adjustments, all such adjustments were computational adjustments within the meaning of section 6231(a)(6).

Computational adjustments are not subject to the full panoply of restrictions on assessments that apply to an "assessment of a deficiency attributable to any partnership item" under section 6225. By way of example, which is not the case here, under section 6222(c), in the event of "any computational adjustment required to make the treatment of the items by * * * [a] partner consistent with the treatment of the items on the partnership return", the Commissioner may dispense with an FPAA and proceed to make a direct assessment of the computational adjustment. If the Commissioner "erroneously computed any [such] computational adjustment", under section 6230(c)(1)(A)(i) the partner is not eligible for a prepayment remedy but instead must pay the tax and file a claim for refund.

Another example, which also does not apply here, is presented by section 6230(c)(1)(A)(ii). As set forth in that section, if the Commissioner "erroneously computed any computational adjustment necessary * * * to apply to the partner a settlement, * * * [an FPAA], or the decision of a court in an action" relating to the readjustment of partnership items, then the partner is restricted to a refund forum and may not litigate in deficiency mode. In other words, the partner has to first pay the tax and then file a claim for refund. *See* sec. 6230(c)(2).

III. *Is the Family FPAA Valid?*

A. *TEFRA Segregates Partnership and Nonpartnership Items*.

TEFRA's design is premised on the conceptual dichotomy of partnership and nonpartnership items. And TEFRA's procedures require "administrative and judicial resolution of dis-

---

[19] The other items shown on the Family FPAA make no change or "adjustment" to Family's return. *See* motion to stay 11 ("The Family FPAA, but for its prematurity vis-a-vis the source partnership proceedings, is otherwise a valid no change FPAA, in that it addresses items reported on the Family return that respondent determined were correctly reported.").

putes involving partnership items to be separate from and independent of disputes involving non-partnership items." *Maxwell v. Commissioner*, 87 T.C. 783, 788 (1986) (citing H. Rept. 97–760, at 611 (1982) and section 6226(a) and (f)).

The terms "partnership item" and "nonpartnership item" are defined in section 6231(a)(3) and (4), respectively, as follows:

The term "partnership item" means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.

* * * The term "nonpartnership item" means an item which is (or is treated as) not a partnership item.

### B. *Computational Adjustments Represent Deficiency Consequences*.

By comparison, and as mentioned above, pursuant to section 6231(a)(6), "The term 'computational adjustment' means the change in the tax liability of a partner which properly reflects the treatment under this subchapter of a partnership item." Thus, a computational adjustment is the consequence to the partner of a determination, whether administrative or judicial, regarding "the treatment under this subchapter of a partnership item."

Also instructive in this context is section 6230(a)(1), which governs the application of "subchapter B of this chapter * * * to *the assessment or collection* of any computational adjustment." (Emphasis supplied.) "Subchapter B of this chapter" refers to the deficiency procedures set forth in sections 6211 through 6216. Thus, it is readily apparent from the language of section 6230(a)(1) quoted above that computational adjustments are viewed as representing the "deficiency impact" of the proper tax treatment of the underlying partnership items. This partner-level deficiency consequence may directly flow from an adjustment of a partnership item. Alternatively, it may arise from an item affected by an adjustment of a partnership item, a so-called affected item under section 6231(a)(5).

Where the computational adjustment flows from affected items, which themselves require partner-level determina-

tions, then section 6230(a)(2) affords the partner a prepayment forum to challenge the Commissioner's partner-level determinations and his resulting computational adjustment. In the absence of any affected items requiring partner-level determinations, the partner cannot dispute the Commissioner's computational adjustment in deficiency mode. Instead, the Commissioner can make a direct assessment, and the partner's remedy is limited to a claim or suit for refund. *See* sec. 6230(a)(1), (c)(4).

C. *Deficiency Consequences Must Await Completion of Source Partnership Proceedings*.

Because a computational adjustment follows an administrative or judicial resolution of the treatment of one or more partnership items, it stands to reason that a computational adjustment itself cannot be the subject of partnership-level proceedings. In *GAF Corp. & Subs. v. Commissioner*, 114 T.C. 519, 525 (2000), we had followed *Maxwell* and its progeny to conclude that we lack jurisdiction to redetermine the effects of the Commissioner's partnership-level adjustments "prior to completion of the TEFRA partnership procedures". We had characterized any notice that the Commissioner may issue in the intervening period as "ineffectual" and held it to be invalid. Though *GAF Corp. & Subs.* and the *Maxwell* line of cases dealt with notices of deficiency issued to partner-taxpayers, their logic applies with equal force to an FPAA issued to an interim partnership that purports to make only computational adjustments.

In *GAF Corp. & Subs.* we had construed section 6225(a) as foreclosing the Commissioner from initiating a partner-level action before the underlying partnership-level proceeding has come to a close. We had reasoned that the Commissioner "'has no authority to assess a deficiency attributable to a partnership item until after the close of a partnership proceeding.'" *GAF Corp. & Subs. v. Commissioner*, 114 T.C. at 526 (quoting *Dubin v. Commissioner*, 99 T.C. 325, 328 (1992)).

As mentioned above, we must consider adjustments shown on the Family FPAA as representing the deficiency impact of the adjustments made to the partnership items of the source partnerships. The reasoning advanced in *GAF Corp. & Subs.*

would imply that adjudicating adjustments shown on the Family FPAA must await culmination of the two source partnership-level proceedings.

Not just the intrinsic rationale but also the explicit holding of *GAF Corp. & Subs.* precludes respondent from issuing an FPAA to Family, which shows nothing more than computational adjustments, before the completion of the partnership-level proceedings for the source partnerships. Each item adjusted by the Family FPAA is an "affected item" within the meaning of section 6231(a)(5). As discussed above, adjustments shown on the Family FPAA simply translate, in tax liability terms, the adjustments made to the partnership items of Group and Trading. Thus, any item adjusted pursuant to the Family FPAA "is affected by a partnership item", viz, the underlying partnership item belonging to either Group or Trading. This partnership item, in turn, would have been adjusted pursuant to the respective source FPAA.

We held in *GAF Corp. & Subs. v. Commissioner*, 114 T.C. at 526 (quoting *Dubin v. Commissioner*, 99 T.C. at 328), that "'since the tax treatment of affected items depends on partnership level determinations, affected items cannot be tried * * * until the completion of the partnership level proceeding.'" It would follow that the affected items that respondent seeks to adjust by the Family FPAA "cannot be tried * * * until the completion of the [respective source] partnership level proceeding."

D. *We Lack Jurisdiction Over the Family Case.*

For the same reasons that we had advanced in *GAF Corp. & Subs.*, we hold here that an FPAA issued to an interim partnership showing nothing more than computational adjustments is invalid and does not confer jurisdiction on us.

As outlined above, the Commissioner proceeds against a partner-taxpayer after a TEFRA partnership-level proceeding by first making a computational adjustment. *See* secs. 6230, 6231(a)(6). If the computational adjustment does not involve affected items requiring partner-level determinations, then the Commissioner may directly assess the amount of the computational adjustment. *See* sec. 6230(a)(1). If, however, any partner-level determinations are required, then the Commissioner must issue a so-called affected items notice of

deficiency to the partner-taxpayer. *See* sec. 6230(a)(2). *GAF Corp. & Subs.* has interpreted section 6225(a) to preclude the Commissioner from issuing this notice before the partnership-level proceeding has come to a close. And the plain language of section 6225(a) prohibits an "assessment of a deficiency attributable to any partnership item" before a partnership-level decision becomes final.

Thus, whether or not partner-level determinations are required, the Commissioner must wait for the completion of the partnership-level proceedings before he can commence assessing a computational adjustment against the partner-taxpayer. Any notice that the Commissioner may issue before that time that purports to make a computational adjustment, whether in the guise of an FPAA or otherwise, is therefore ineffective for conferring jurisdiction on us. Respondent acknowledges that the Family FPAA makes only those adjustments that section 6231(a)(6) terms "computational adjustments". We conclude that this FPAA, which seeks to give effect to the adjustments shown in the Group FPAA and the Trading FPAA, is invalid because it was issued before the partnership-level proceedings in the Group case and the Trading case were completed.

IV. *Lack of Subject Matter Jurisdiction Prevents a Stay*.

Respondent asserts that the Family FPAA is otherwise valid but merely premature. *See* motion to stay 8–9 ("Respondent requests that the Court stay this case rather than dismiss the determinations of the Family Affected Items under the holding in *GAF v. Commissioner*".). We cannot stay the proceeding in a case over which we lack subject matter jurisdiction. As the Supreme Court explained in *Arbaugh v. Y & H Corp.*, 546 U.S. at 514, "when a federal court concludes that it lacks subject matter jurisdiction, the court must dismiss the complaint in its entirety." *Cf. Thompson v. Commissioner*, 137 T.C. 220, 224–226 (2011) (holding "[v]oid [a]b [i]nitio * * * an affected items notice of deficiency * * * [issued] in the absence of a need for partner-level determinations").

Further, in respondent's request to stay, rather than dismiss, the proceeding in the Family case, we detect echoes of the dissent's reasoning in *GAF Corp. & Subs. v. Commis-*

*sioner*, 114 T.C. at 531 (Halpern, J., dissenting) ("A reasonable interpretation of the statute does not require that we dismiss this type of case for lack of jurisdiction, only that, if necessary, we defer proceeding until consideration of the affected items is appropriate."). The dissent's statutory interpretation was not adopted by the Court's majority in *GAF Corp. & Subs.* and stare decisis prevents us from revisiting that argument here.

We are cognizant of respondent's concern that the "no-second-FPAA" rule of section 6223(f) may be deployed as a shield to seek immunity for Family from another round of partnership-level proceedings. In particular, respondent worries that if we hold invalid the Family FPAA, then "the ability to issue a second notice under 6230(a)(2)(C) is not available." Motion to stay 10. Section 6230(a)(2)(C) carves out exceptions from the "no-second-deficiency notice" rule of section 6212(c), but only for affected items notices of deficiency issued under 6230(a)(2)(B). Section 6230(a)(2)(C) says nothing about the Commissioner's ability to issue another FPAA to a partnership if the first FPAA has been held invalid.

Respondent notes that "Family is itself subject to the TEFRA partnership rules requiring the issuance of a notice of final partnership administrative adjustment to Family's partners under section 6223(f) [sic] rather than a notice of deficiency under section 6212." Motion to stay 10. We assume that, instead of citing section 6223(f), respondent intended to refer to section 6223(a), which requires the Secretary to "mail to each partner whose name and address is furnished to the Secretary notice of * * * the beginning of an administrative proceeding at the partnership level with respect to a partnership item, and * * * the final partnership administrative adjustment resulting from any such proceeding [i.e., an FPAA]."

Respondent argues against applying *GAF Corp. & Subs.* and invalidating the Family FPAA because "section 6223(f) would prohibit respondent from issuing a second FPAA to Family after the completion of the source partnership proceedings." Motion to stay 10. Respondent depicts the following "doomsday scenario" if we were to dismiss the Family case for lack of jurisdiction: "Respondent would be forever barred from having an opportunity to disallow Family's

claimed flow-through losses from the source partnerships." *Id.*

Assume arguendo that respondent in his motion to stay is entirely accurate in his assertion about the need for an FPAA to Family, and completely prophetic in his prediction regarding the impact of our dismissing the Family case for lack of jurisdiction. Nevertheless, we still would not be persuaded to exercise jurisdiction over the Family case.

As noted above, our jurisdiction is conferred by statute. Specifically, we were established "under article I of the Constitution of the United States". Sec. 7441. Although an Article I creation, "the [Tax] [C]ourt exercises a portion of the judicial power of the United States". *Freytag v. Commissioner*, 501 U.S. 868, 891 (1991). However, we cannot exercise jurisdiction that Congress has not explicitly granted us. *See also Commissioner v. Gooch Milling & Elevator Co.*, 320 U.S. 418, 422 (1943) ("The Internal Revenue Code, not general equitable principles, is the mainspring of the * * * [Tax Court's] jurisdiction."). *Compare* sec. 7442 ("The Tax Court and its divisions shall have such jurisdiction as is conferred on them by this title") *with* U.S. Const., article III, sec. 2, cl. 1 ("Jurisdiction of [Article III] Courts * * * shall extend to all Cases, in Law *and Equity*, arising under this Constitution" (emphasis supplied)).

Unlike an Article III court, "the Tax Court, being a court of limited jurisdiction, * * * [does] not have equitable power to expand its jurisdiction". *Buchine v. Commissioner*, 20 F.3d 173, 178 (5th Cir. 1994) (citing *Continental Equities, Inc. v. Commissioner*, 551 F.2d 74, 79 (5th Cir. 1977)). Thus, in determining the outer limits of the ambit of our subject matter jurisdiction, we cannot consider the consequences, howsoever harsh they may be, that our decision inflicts upon one of the parties. In particular, we do not "possess[ ] general equity jurisdiction", *Gooch Milling & Elevator Co.*, 320 U.S. at 421, that could be exercised to prevent or undo an inequitable outcome, *see also Commissioner v. McCoy*, 484 U.S. 3, 7 (1987) ("The Tax Court is a court of limited jurisdiction and lacks general equitable powers.").

But the inequitable outcome that respondent fears and foretells may not be inevitable. There are good reasons to believe that respondent is being unduly pessimistic in prognosticating the effects of our invalidating the Family

FPAA. [20] The gloom and doom in respondent's motion to stay seem to us to be unwarranted.

Strictly speaking, it lies beyond the scope of our inquiry here to consider and opine on whether, following our decision to invalidate the Family FPAA before us and dismiss the Family case for lack of jurisdiction, respondent may be able to proceed against Family without issuing another FPAA. [21] We point out, however, that crucial to our conclusion that we lack jurisdiction over the Family case is the provision in section 6231(a)(6) that "All adjustments required to apply the results of a proceeding with respect to a partnership * * * to an indirect partner shall be treated as computational adjustments." While this sentence serves to deprive us of jurisdiction over the Family case, it may also indicate a path that respondent can traverse that does not require another Family FPAA.

To the extent the first Family FPAA, which we are invalidating here, represented a computational adjustment, respondent should be able to proceed against the indirect partner, Mr. Rawls, without a Family FPAA. If, after the partnership-level proceedings in the Group and Trading cases are completed, no partner-level determinations are required, then respondent should be able to make a direct assessment of the computational adjustment. If, on the other hand, partner-level determinations are required, then respondent should be able to follow the "affected items" deficiency procedures of section 6230(a)(2). Further, the partner-level determinations specified in section 6230(a)(2) may encompass both direct and indirect partners.

The definition of "partner" in section 6231(a)(2) includes not just a "partner in the partnership", but also "any other person whose income tax liability * * * is determined in

---

[20] The motion to stay seems at variance with the Commissioner's other communications addressing the need for an FPAA to proceed against an upper tier partnership. In fact, the Commissioner's thinking on this matter appears to be in flux. *Compare* CCA 201020017 (May 21, 2010) (suggesting, for a tiered partnership structure, that "if the [challenged] deduction is an affected item requiring partner level determinations we may have to issue an affected item notice to disallow the deduction as an affected item. Since the partner is itself a TEFRA partnership, we may have to issue an *affected item FPAA* at that level to make this determination" (emphasis supplied)) *with* CCA 200907033 (Feb. 23, 2009) (declaring that "We don't issue FPAAs to [upper] tier partnerships if the adjustment originates in another 'source' partnership. We only issue an FPAA for the source partnership to all of its partners (including its partnership partners).").

[21] Such an FPAA to Family would presumably represent the "affected items FPAA" referred to in CCA 201020017. *See supra* note 20.

whole or part by taking into account *directly or indirectly* partnership items of the partnership." (Emphasis supplied.) There is no reason a single "affected items" deficiency proceeding under section 6230(a)(2) should not suffice to make any factual determinations required to give effect to the findings and holdings of the Group and Trading cases.

V. *Source Partnership Proceedings Stand Alone.*

Finally, we observe that our conclusion here is perfectly congruent with our holding in *Sente Inv. Club P'ship of Utah v. Commissioner*, 95 T.C. 243 (1990), that a proceeding involving a pass-thru interim partner cannot affect the treatment of items originating with lower tier source partnerships. We held there that the treatment of items in source partnerships must be determined in separate proceedings involving those partnerships. In doing so, we noted that "the notice provisions [of TEFRA] with respect to indirect partners are calculated to permit them an opportunity to participate in the *only* proceeding in which adjustments to the return of the partnership in which they hold an indirect interest may be contested." *Id.* at 249 (emphasis supplied).

It follows that the only proceedings in which adjustments to the returns of the source partnerships, in which Mr. Rawls holds an indirect interest, may be contested are the Group and Trading cases. The Family FPAA is invalid, and we lack jurisdiction over the Family case.

The Court has considered all of petitioners' and respondent's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

> *An order of dismissal for lack of jurisdiction will be entered in docket No. 12938–07.*