T.C. Memo. 2013-195

UNITED STATES TAX COURT

JIMASTOWLO OIL, LLC, ET AL.,[1] JOHN J. PETITO, TAX MATTERS
PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 11316-08, 11332-08,        Filed August 26, 2013.
            21586-09, 22706-09,
            11263-10.

        J and OC (LLCs) each purchased a 7.93% working interest in
an oil and gas leasehold. Each deducted expenses on its returns for
the audit years (2004-06 for J, 2004 and 2005 for OC) that were
allegedly associated with its working interest. R issued notices of
final partnership administrative adjustment (FPAAs) to the LLCs
denying the deductions, treating reported losses as passive activity

---

[1]The following cases are consolidated herewith: Oil Coming We Are
Humming LLC, John J. Petito, Tax Matters Partner, docket No. 11332-08;
Jimastowlo Oil, LLC, John J. Petito, Tax Matters Partner, docket No. 21586-09;
Oil Coming We Are Humming, LLC, John J. Petito, Tax Matters Partner, docket
No. 22706-09; and Jimastowlo Oil LLC, John J. Petito, Tax Matters Partner,
docket No. 11263-10.

[*2] losses under I.R.C. sec. 469, and asserting accuracy-related penalties under I.R.C. sec. 6662. After a trial addressing the issues raised in the FPAAs (substantive issues), we issued an order directing the parties to address our concern that the so-called income programs purchased by the LLCs constituted partnerships for Federal income tax purposes so that we were without jurisdiction to consider the merits of what would then be the LLCs' pass-through deductions from a source partnership (i.e., computational adjustments) at the LLCs' (partner) level, before the propriety of those deductions had been decided at the source partnership level, citing Sente Inv. Club P'ship of Utah v. Commissioner, 95 T.C. 243, 248 (1990); Maxwell v. Commissioner, 87 T.C. 783, 788 (1986); and Alhouse v. Commissioner, T.C. Memo. 1991-652, aff'd sub nom. Bergford v. Commissioner, 12 F.3d 166 (9th Cir. 1993). Both parties moved to reopen the record, which we did, and we conducted a second trial to address the jurisdictional issue. R argues that the income programs did not constitute partnerships for Federal tax purposes and that, therefore, we have jurisdiction to decide the substantive issues. P argues that the LLCs were members of "de facto" partnerships so that we lack jurisdiction to decide the substantive issues.

     1. Held: Each LLC, together with the other working interest owners in the leasehold, joined together to conduct an unincorporated business, which, for Federal income tax purposes, must be classified as a partnership.

     2. Held, further, the FPAAs issued to the LLCs, to the extent that they make adjustments only with respect to the substantive issues (partnership items), are invalid because there have been no source partnership-level proceedings.

     3. Held, further, we will, therefore, on our own motion dismiss these consolidated cases for lack of jurisdiction insofar as the individual FPAAs pertain to computational items.

**[*3]**   John J. Petito, pro se.

Theodore Robert Leighton, Diane R. Mirabito, Andrew Ira Ouslander, and

Deborah Aloof, for respondent in docket Nos. 11316-08, 11332-08, 21586-09, and

22706-09.

Theodore Robert Leighton, Diane R. Mirabito, Andrew Ira Ouslander,

Deborah Aloof, and Joshua Nachman, for respondent in docket No. 11263-10.


MEMORANDUM FINDINGS OF FACT AND OPINION


HALPERN, Judge:  These consolidated cases are partnership-level actions

based upon petitions filed pursuant to section 6226.[2]  Jimastowlo Oil, LLC

(Jimastowlo), and Oil Coming We Are Humming, LLC (Oil Coming), the two

---

[2]Unless otherwise indicated, all section references are to the Internal
Revenue Code as amended.

Sec. 6226 is one of a group of provisions (currently comprising secs. 6221-
6234) entitled "Tax Treatment of Partnership Items" that was added to the Internal
Revenue Code by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA),
Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648 (TEFRA partnership provisions).
In general, those provisions establish special procedures for auditing partnership
returns whereby the return is subject to a single audit in which one partner acts for
the partnership but all partners are bound by the results of the audit.  The audit
results may be contested in court in a unified proceeding the results of which are
also binding upon all partners.  See Boris I. Bittker & Lawrence Lokken, Federal
Taxation of Income, Estates and Gifts, para. 112.3.1, at S112-88 (Cum. Supp. No.
2, 2013).

**[\*4]** entities involved in these consolidated cases (together, LLCs), are New York limited liability companies that, pursuant to section 301.7701-3(b)(1)(i), Proced. & Admin. Regs., constitute partnerships for Federal income tax purposes. The petitioner in each case is John J. Petito, presently tax matters partner, who resided in New York when he filed the petitions.

Consistent with their tax classification as partnerships, both Jimastowlo and Oil Coming filed Forms 1065, U.S. Return of Partnership Income, for the audit years (2004-06 for Jimastowlo and 2004-05 for Oil Coming). The petitions were filed in response to respondent's notices of final partnership administrative adjustment (FPAAs) issued to the tax matters partner for each LLC for each of the audit years. Respondent's FPAAs (1) disallow deductions claimed by the LLCs in connection with their percentage shares in working interests in oil and gas leaseholds and (2) determine accuracy-related penalties, under section 6662, with respect to partnership items of the LLCs. In addition, in the FPAA issued to Jimastowlo for 2006 and in his answer to the petition filed on behalf of Oil Coming with respect to 2005, respondent asserts that the passive activity loss limitation rules of section 469 apply; i.e., that the exception to those rules afforded by section 469(c)(3) for working interests in oil and gas property is inapplicable to Jimastowlo for 2006 and to Oil Coming for 2005. Petitioner defends the

**[*5]** challenged deductions, denies that section 469 applies, denies that the section 6662 accuracy-related penalty applies, and asserts, presumably as an alternative to the challenged deductions, that, because both of the LLCs invested in what was discovered, in 2006, to be a "Ponzi scheme", each is entitled to a 2006 theft loss deduction for its entire investment under section 165(e). We conducted a trial (first trial) in September 2010, after which the parties submitted briefs addressing the foregoing issues (substantive issues).

During our consideration of the substantive issues, we became concerned that certain so-called income programs purchased by the LLCs (which gave rise to the disputed deductions) constituted partnerships for Federal income tax purposes. As will be more fully explained below, the term "income program" was used by a company named Energytec, Inc. (Energytec), to identify a group of oil and gas wells, and the percentage working interest therein, purchased by a particular purchaser from Energytec. If our concern was borne out, the substantive issues would, within the meaning of section 6231(a)(3), constitute "partnership items", determinable, pursuant to section 6221, at the partnership level. In that event, we would be without jurisdiction to decide the substantive issues in the partner-level proceeding before us. We ordered supplemental briefing addressing (1) whether the income programs in which the LLCs had invested constituted partnerships

[*6] subject to the TEFRA partnership provisions and (2) if so, whether we should dismiss these consolidated cases on our own motion for lack of jurisdiction. We also directed that, should either party consider it necessary to introduce additional evidence in order to properly address those issues, that party should move to reopen the record for that purpose. Both parties so moved, we granted the motions, and we conducted a further trial (second trial), at which the parties introduced testimony and documentary evidence. After the second trial, the parties submitted the supplemental briefs that we had ordered. Respondent argues that the LLCs were not, on account of their oil and gas investments, partners in any partnerships, and so we should not dismiss these cases for lack of jurisdiction. Petitioner argues that the investments were in "de facto" partnerships and we should dismiss.

It is within our authority to raise the issue of jurisdiction. E.g., Gould v. Commissioner, 139 T.C. 418 (2012). As the party alleging jurisdiction, respondent bears the burden of proving jurisdictional facts by a preponderance of the evidence. See Zunamon v. Brown, 418 F.2d 883, 886 (8th Cir. 1969) (citing McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936)).

We find that, on account of each LLC's purchase of an income program, each was a member of a partnership for Federal income tax purposes. We are

[*7] therefore precluded by section 6221 from considering the substantive issues, including the additional issues raised by respondent of whether, if partnerships do exist, those partnerships should be disregarded on account of a lack of economic substance or on account of some other antiabuse doctrine. We will dismiss for lack of jurisdiction insofar as the individual FPAAs pertain to computational items.

## FINDINGS OF FACT

The LLCs' Investments in the Schuyler and J.B. Milstead Oil Leases

Energytec, a Nevada corporation, was organized in 1999 to engage in oil- and gas-producing activities through the acquisition of oil and gas leaseholds that, previously, had been the object of exploration and producing activity and that no longer were producing or operating because of abandonment or neglect. Energytec's rights in those leaseholds constituted what are known as "working interests".[3]

Each LLC paid $102,720 for its 7.93% share of Energytec's working interest in certain leaseholds. The working interest in which Jimastowlo shared involved

---

[3]Black's Law Dictionary 1745 (9th ed. 2009) defines a working interest in oil and gas as: "The rights to the mineral interest granted by an oil-and-gas lease, so called because the lessee acquires the right to work on the leased property to search, develop, and produce oil and gas, as well as the obligation to pay all costs."

**[*8]** 11 oil wells on the Schuyler leasehold, Rusk County, Texas (Schuyler leasehold). The working interest in which Oil Coming shared involved nine oil wells on the J.B. Milstead leasehold, Rusk County, Texas (Milstead leasehold). Each LLC obtained its share of Energytec's working interest pursuant to an "Assignment, Bill of Sale and Conveyance" from Energytec dated April 26, 2005, in Jimastowlo's case, and April 4, 2005, in Oil Coming's case. The assignment to Jimastowlo stated that it was "to be effective as of December, 2004, at 7:00 a.m.", and the one to Oil Coming stated that it was "to be effective as of September, 2004, at 7 a.m." Both assignments were executed on behalf of Energytec by Don Lambert, Assistant to the President, Energytec, Inc. The assignment to Jimastowlo was not recorded under Texas law until November 6, 2006, and there is no evidence that the assignment to Oil Coming was ever recorded.

Before receiving the foregoing assignments, the LLCs received evaluation reports (evaluation reports) with respect to the oil wells included in the working interests in which they would share. The evaluation reports, dated December 2004 in the case of the Schuyler leasehold and September 2004 in the case of the Milstead leasehold, were prepared for Energytec by Frank W. Cole Engineering (Cole Engineering). The evaluation report with respect to the Schuyler leasehold referenced Income Program No. 105, and the evaluation report with respect to the

**[*9]** Milstead leasehold referenced Income Program No. 70.  As stated, the term "income program" was used by Energytec to identify the wells, and the percentage share in the working interest therein, offered by it to a particular purchaser.  For example, Income Program No. 105 identified the 11 wells on the Schuyler leasehold and the 7.93% working interest therein that Jimastowlo purchased from Energytec, and Income Program No. 70 identified the 9 wells on the Milstead leasehold and the 7.93% working interest therein that Oil Coming purchased from Energytec.  Other persons, or groups of persons, identified in the record purchased percentage working interests in both the Schuyler leasehold and the Milstead leasehold.  Income Program No. 107 identified More in Oil LLC as the owner of a 7.93% working interest in the 11 wells on the Schuyler leasehold, and Income Program No. 70 identified Robert Ackerman as the owner of a 7.93% working interest in the 9 wells on the Milstead leasehold.  Energytec retained a 6.575% working interest in the wells on each of those leases.

Each evaluation report describes the history of the field of which the leasehold in question was a part (e.g., number of wells, total production to date) and the geological features of the leasehold area.  Each recites that Energytec acquired the leasehold in question and operates the wells on it.  Each then states that "Energytec is offering to sell a Program of 16 units for a total price of

**[*10]** $102,720, with the Program having a 7.93% working interest in each of the * * * [11 wells, in the case of the Schuyler lease, or 9 wells, in the case of the Milstead lease]." Each evaluation report contains projections of the monthly pro rata gross income, operating expenses, and net operating income for each "Program" (investor), together with a table showing the projected "'turn-key' costs of acquiring and reworking the * * * [11 or 9 wells]." The evaluation reports project monthly net operating income of $3,440 for each investor in the Schuyler leasehold wells and $3,600 for each investor in the Milstead leasehold wells. The evaluation report with respect to the Schuyler leasehold states: "Effective date of the Assignment is December 30, 2004 and the first disbursement will be made in Mid-April 2005." The evaluation report with respect to the Milstead leasehold states an effective date-of-assignment of September 1, 2004, and an initial disbursement date of "Mid-November 2004." Each evaluation report concludes with a "summary" stating: "This is an old producing lease with a long history of satisfactory oil production. These wells should produce economically for the next 10 to 15 years with a modest decline rate. This should be an excellent long term investment."

**[*11]** Operation of the Wells

Usually, the arrangement among the owners of working interests in the same well or wells is governed by the terms of a joint operating agreement agreed to by all of the owners, which sets forth the rights, duties, and obligations of each party to the agreement. Among other things, the operating agreement designates an operator, who conducts and controls operations of the well (i.e., producing the oil and gas from the well, billing the nonoperators for costs incurred, and distributing the profits, if any). During the audit years, Energytec operated the wells on the Schuyler and Milstead leaseholds on a cooperative basis (i.e., as an economic activity collectively owned and cooperatively exploited) for the working interest owners, but it did so without benefit of a joint operating agreement executed by the working interest owners. To carry out the actual operation of the wells during the audit years, Energytec employed, first, Cole Engineering (until April 1, 2006), and, thereafter, Commanche Well Service Corp. (Commanche), a wholly owned subsidiary of Energytec. Each collected oil from the wells in tanks, sold the collected oil, offset operating expenses against sale proceeds, and apportioned what proceeds remained among the working interest owners in proportion to their percentage interests. No working interest owner could take in kind or sell on its own its share of any oil production.

[*12] In May 2006, Energytec presented the LLCs and the other working interest owners in the Schuyler and Milstead leaseholds with draft joint operating agreements formally designating Commanche as operator of the wells on the respective leaseholds. Many of the leasehold owners, including the LLCs, would not execute the draft agreements.

Payments to Working Interest Owners

The predictions in the evaluation reports regarding oil well production turned out to be wildly optimistic. From the inception of their interests until March 2006, Energytec did make monthly payments to the LLCs as stated in the evaluation reports: $3,440 to Jimastowlo and $3,600 to Oil Coming.[4] But, as stated in the evaluation reports, those payments were based on "projected" net income from drilling operations, not actual net income, and the income projections were based on projected production, which was substantially in excess of actual production. As of May 15, 2006, Energytec categorized many of the wells included in both the Schuyler and Milstead leases as "Non Producing Operational Hold".

---

[4]The March 2006 and April 2006 payments to Oil Coming were $1,532.43 and $1,242.27, respectively.

[*13] As a result of the imbalance between net income from production and payments to working interest owners involved in Energytec's various drilling operations, including those with respect to the Schuyler and Milstead leaseholds, Energytec sent a "Working Interest Report", dated May 22, 2006, to the LLCs and the other working interest owners. The working interest reports advise of Commanche's replacement of Cole Engineering as operator of Energytec's oil and gas interests, and exhibit A attached to each report sets forth each LLC's investment in its respective drilling program, the total amount, as of March 31, 2006, paid to each, and each's pro rata share of the actual net revenue to that date from the program. Those pro rata shares were the amounts each LLC would have received had it been paid only its 7.93% working interest share of net revenues. The excess of the payments to each over its pro rata share of net revenue is denominated an amount due Energytec. The working interest report explains that, normally, in oil and gas operations of the kind in which the LLCs were involved (which the report calls "Joint interest operations, sometimes referred to as Joint Ventures"), the operator bills the working interest owners for their pro rata shares of the monthly expenditures and, monthly, remits to them their pro rata shares of the net revenues from operations after expenses. The report then notes that, in the case of Energytec's jointly owned oil and gas drilling operations,

[*14] the majority of the working interest owners were receiving recurring payments that did not fluctuate regardless of production, oil and gas prices, or lease operating expenses * * * [L]ease operating expense and capital expenditures on the majority of the leases held by working interest owners has been paid by Energytec with no provision for * * * [joint interest billings]. The effect of these recurring payments and the costs borne by Energytec was the acceleration of the return on the investment by working interest owners to the detriment of the cash position and earnings of Energytec.

After reiterating that "[i]n many cases, the recurring payments * * * have exceeded the net revenue that was due to the working interest owners", the report states: "If this situation applies to you, subsequent revenue distributions will be applied against the outstanding balance due to Energytec until the balance is collected in full." As an alternative, the affected working interest owners were offered the right to "pay the outstanding balance due Energytec and subsequently receive revenue distributions based upon actual revenues less applicable lease operating expenses."

Exhibit A attached to the working interest report sent to Jimastowlo lists amounts paid to Jimastowlo, as of March 31, 2006, of $37,840 and net revenue, as of that date, from actual production (gross revenue of $2,549 less actual expenses of $1,565) of $984, resulting in an amount due Energytec of $36,856. The corresponding figures for Oil Coming, as of March 31, 2006, were payments of

**[*15]** $59,132 and net revenue from actual production (gross revenue of $26,762 less actual expenses of $6,762) of $20,000, resulting in $39,132 due Energytec.

Thereafter, both Jimastowlo and Oil Coming began receiving monthly statements of "Amount Due To Energytec" from Energytec showing a "Balance Forward" of the amount due reduced by each's pro rata share of the net revenue from "Current Month Activity", resulting in an "Ending Balance" of the amount due to be carried over to the subsequent month. Statements of account sent to Jimastowlo show an amount due Energytec of $36,856 as of November 30, 2009 (the same amount due as set forth on exhibit A of the May 22, 2006, working interest report sent to Jimastowlo), indicating that there was no net revenue from production associated with the Schuyler leasehold wells between May 22, 2006, and November 30, 2009. Statements of account sent to Oil Coming show that, by December 31, 2009, Oil Coming's amount due Energytec had been reduced from $39,132 to $26,101 by its pro rata share ($13,031) of net revenue from production associated with the Milstead leasehold wells.

Litigation Instituted by the Working Interest Owners

Many of the working interest owners (other than Energytec) were unhappy with the state of affairs described in the working interest reports. They sent letters to Energytec objecting and demanding to be paid on the basis of monthly projected

[*16] production rather than actual net revenues from production, the former being consistent with what they believed to be their agreement or understanding with Frank W. Cole (representing both Cole Engineering and Energytec and who, before March 18, 2006, was the chairman of the board, chief executive officer, and chief financial officer of Energytec) as to the nature of their working interests.

Thereafter, on October 23, 2007, Jomar Oil, LLC (Jomar), a working interest owner involved in one of Energytec's oil well drilling programs, instituted suit against Energytec, Frank W. Cole, and other individuals in the U.S. District Court for the Northern District of Texas seeking rescission of the investment and monetary damages for alleged misrepresentation, fraud, violation of Federal and State securities laws, breach of contract, and conversion of funds on the part of the defendants (Jomar litigation). Jomar was joined in that suit by numerous other working interest owners involved in Energytec drilling programs, including the LLCs, by the filing of an "Amended Consolidated Complaint" in June 2008 and a "Consolidated Complaint" in November 2008. Jimastowlo alleged, with respect to "Income Program 105" (consisting of its share of the working interest in the Schuyler leasehold wells), that Energytec's evaluation report and the purchase agreement knowingly or recklessly "made material misrepresentations and false statements". In addition, Jimastowlo incorporated allegations common to all of

[*17] the consolidated plaintiffs that Energytec omitted material facts, including the fact that "the true nature of the Income Programs was a 'Ponzi' scheme, or part of a 'Ponzi' scheme being perpetrated by * * * [Energytec] whereby * * * the investment returns promised to the Plaintiffs were illusory".  Oil Coming made essentially identical allegations with respect to "Income Program 70" (consisting of its share of the working interest in the Milstead leasehold wells).  In its answer, dated December 17, 2008, Energytec denied the allegations of the various plaintiffs, including those of Jimastowlo and Oil Coming, sought rejection of all claims, and asserted counterclaims for unreimbursed amounts paid in excess of net revenues.

On June 26 and July 10, 2009, the court denied motions by two of the individual defendants in the Jomar litigation to dismiss the consolidated complaint.  See Jomar Oil, LLC v. Energytec, Inc., No. 3:07-CV-1782-LECF, 2009 WL 1856582 (N.D. Tex. June 26, 2009); Jomar Oil LLC v. Energytec, Inc., No. 3:07-CV-1782-L, 2009 WL 2002918 (N.D. Tex. July 10, 2009).  Subsequently, in its order dated February 19, 2010, the court, having considered the parties' status report and having stayed the claims against Energytec on account of its chapter 11 bankruptcy, determined that "it is appropriate to stay the remaining claims brought by Plaintiffs and * * * Third-Party Plaintiffs", and it

**[*18]** further determined that the case "should be, and is hereby, administratively closed." The court directed the parties to move to reopen the case within 30 days of the end of bankruptcy proceedings or upon the lift of the bankruptcy stay. To date, there has been no decision on the merits in the Jomar litigation.

LLCs' Returns

None of the Forms 1065 that the LLCs filed for the audit years indicates that either was a member of any partnership or joint venture, nor do those returns identify any gross receipts or deductions attributable to another (source) partnership. On line 3 of Schedule B, Other Information, of each of those returns, each LLC answered no to the question whether it owned any interest in another partnership, nor did those returns contain entries derived from a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., issued to the LLCs by any source partnership. Most, if not all, of the LLCs' deductions that respondent challenges herein (e.g., "oil & gas expenses-IDC", "oil depletion exp", "oil & gas production expenses", "qual production activities") relate to the production (or attempted production) of oil. All of the Forms 1065 for the audit years state the LLCs' principal business activity to be manufacturing and state its principal product or service to be oil and gas production.

**[*19]** Energytec's Returns

The Forms 1120, U.S. Corporation Income Tax Return, filed by Energytec for 2004-06 state its principal business activity as oil and gas exploration. The Form 1120 for 2004 reports gross receipts of over $16 million attributable to "Disposition of various working interests". None of those returns reports any income from U.S. partnerships or "pass-through" entities or (for 2006) from "nonincludible [in its consolidated return] U.S. entities." No Schedules K-1 are attached to any of those returns.

OPINION

I.    Applicable Principles of Law

A.    Definitions of Partnership and Partner

In pertinent part, section 761(a) defines a partnership, for purposes of subtitle A (income taxes) as including a "syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business * * * or venture is carried on". See also section 1.761-1(a), Income Tax Regs., which provides: "The term partnership means a partnership as determined under §§ 301.7701-1, 301.7701-2, and 301.7701-3 of this chapter." In pertinent part, section 301.7701-1(a)(1), Proced. & Admin. Regs., provides: "Whether an organization is an entity separate from its owners for federal tax purposes is a

**[*20]** matter of federal tax law and does not depend on whether the organization is recognized as an entity under local law." In pertinent part, section 301.7701-1(a)(2), Proced. & Admin. Regs., adds: "A joint venture or other contractual arrangement may create a separate entity for federal tax purposes if the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom." It cautions, however: "Nevertheless, a joint undertaking merely to share expenses does not create a separate entity for federal tax purposes." Id. Section 301.7701-2(a), Proced. & Admin. Regs., defines a business entity as "any entity recognized for federal tax purposes * * * that is not * * * a trust * * * or otherwise subject to special treatment". In pertinent part, section 301.7701-2(c)(1), Proced. & Admin. Regs., states: "The term partnership means a business entity that is not a corporation * * * and that has at least two members." See also Commissioner v. Culbertson, 337 U.S. 733, 740 (1949), in which the Supreme Court defined a partnership as "an organization for the production of income to which each partner contributes one or both of the ingredients of income-capital or services." A domestic business entity with two or more members that is not formed as a corporation under State or Federal law (a per se corporation) and that has not elected to be classified as a corporation is

**[*21]** classified as a partnership.  <u>See</u> sec. 301.7701-3(a) and (b)(1), Proced. & Admin. Regs.

Section 6231(a)(1)(A) generally defines "the term 'partnership'", for purposes of the TEFRA provisions, as "any partnership required to file a return under section 6031(a)."  Section 6031(a) applies to partnerships "as defined in section 761(a)".

Section 6231(a)(2)(A) defines a partner as "a partner in the partnership" and, in pertinent part, section 6231(a)(9) defines a "pass-thru partner" as "a partnership * * * through whom other persons hold an interest in the partnership with respect to which proceedings under this subchapter [the TEFRA provisions] are conducted."  Should we find that the operation of the wells on the Schuyler and Milstead leaseholds (sometimes, well operations) for the benefit of Energytec and the other working interest owners, including the LLCs, created separate entities classified as partnerships for Federal income tax purposes (with the LLCs as partners therein), it is clear that, as LLCs taxable as partnerships, the LLCs would constitute "pass-thru" partners under section 6231(a)(9).

[*22] B.    Jurisdiction Over and Definitions of Partnership Items and Affected Items

Section 6221 provides:

SEC. 6221.  TAX TREATMENT DETERMINED AT
            PARTNERSHIP LEVEL.

Except as otherwise provided in this subchapter, [e.g., sections 6223(e)(2), 6227(d)(1), and 6231(b), involving special circumstances in which partnership items are treated as nonpartnership items] the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level.

In pertinent part, section 6231(a)(3) defines a "partnership item" as:  "any item required to be taken into account for the partnership's taxable year * * * to the extent [IRS] regulations * * * provide that * * * such item is more appropriately determined at the partnership level than at the partner level."

Section 301.6231(a)(3)-1(a), Proced. & Admin. Regs., includes as partnership items "more appropriately determined at the partnership level than at the partner level * * * [t]he partnership aggregate and each partner's share of" a number of listed items including "[i]tems of income, gain, loss, deduction, or credit of the partnership" and also including "[t]he depletion allowance under section 613A with respect to oil and gas wells".  Sec. 301.6231(a)(3)-1(a)(1)(i), (vi)(D), Proced. & Admin. Regs.

**[\*23]** Section 6231(a)(5) defines the term "affected item" as "any item to the extent such item is affected by a partnership item."  The existence of an affected item normally results in a "computational adjustment", defined as "the change in the tax liability of a partner which properly reflects the treatment * * * of a partnership item." Sec. 6231(a)(6).  In the case of a computational adjustment that does not require a partner-level determination, the Commissioner is not required to issue a notice of deficiency before assessing the resulting tax deficiency against each partner.  See sec. 6230(a)(1); sec. 301.6231(a)(6)-1(a)(2), Proced. & Admin. Regs.  A computational adjustment that does require a partner-level determination is subject to the deficiency procedures (sections 6211-6216).  See sec. 6230(a)(2); sec. 301.6231(a)(6)-1(a)(3), Proced. & Admin. Regs.

Because affected items depend upon partnership-level determinations with respect to partnership items, any issuance of notice of deficiency or FPAA regarding affected items, and any resulting litigation, must await the outcome of the partnership proceeding or the expiration of the time to initiate one.  See Maxwell v. Commissioner, 87 T.C. 783, 792 (1986).  That rule applies equally to affected items reported by a "pass-thru" partner that were derived from a lower tier or "source" partnership.  See Sente Inv. Club P'ship of Utah v. Commissioner, 95 T.C. 243, 248 (1990).  See also Rawls Trading, L.P. v. Commissioner, 138 T.C.

**[\*24]** 271 (2012), wherein the Commissioner simultaneously issued FPAAs to two lower tier "source" partnerships and one upper tier or "interim" ("pass-thru") partnership.  We held, on our own motion, that, because the FPAA issued to the interim partnership reflected only computational adjustments resulting from adjustments to the source partnership returns, the FPAA issued to the interim partnership was "invalid" and did "not confer jurisdiction on us."  Id. at 288-289.

The principle enunciated in Maxwell, Sente Inv. Club P'ship of Utah, and Rawls Trading, that we lack jurisdiction to redetermine affected items attributable to a source partnership before the source partnership-level proceedings have been completed, applies even when the members of the source partnership have failed to recognize that they have created a separate entity (i.e., a partnership) for Federal income tax purposes and have not, therefore, filed a partnership return on its behalf, and the Commissioner has neither conducted a source partnership-level audit nor issued an FPAA to it.  See Alhouse v. Commissioner, T.C. Memo. 1991-652, aff'd sub nom. Bergford v. Commissioner, 12 F.3d 166, 170 (9th Cir. 1993).

Section 6229(c)(3) provides that, if a partnership fails to file a return for any taxable year (which would be the case herein should we determine that the well operations created separate entities classified as partnerships), "any tax

[*25] attributable to a partnership item (or affected item) arising in such year may be assessed at any time."

### C. Treatment of the Section 469 Issue

Section 469 provides rules limiting passive activity losses and credits. Section 469(c)(3) provides that a working interest in any oil or gas property is, per se, not a passive activity, provided that the interest is not held through an entity that limits the interest holder's liability with respect to that interest. Assuming the well operations did, in fact, create separate entities classified as partnerships for Federal income tax purposes, the issue of whether the members of the LLCs could avoid application of the passive activity loss rules pursuant to section 469(c)(3) should be considered an affected item. That conclusion is based upon the similarity between that issue (i.e., applicability of the limited liability proviso) and the issue of whether partnership losses exceed the amounts for which the partners are at risk under section 465, which we have held to constitute an affected item. See Roberts v. Commissioner, 94 T.C. 853, 861 (1990).

### D. Treatment of the Penalty Issue

The accuracy-related penalties respondent imposed against the LLCs are described as applying "to all under-payments of tax attributable to adjustments of partnership items." Therefore, should we determine that the

[*26] alleged underpayments herein relate to partnership items attributable to source partnerships in which the LLCs are partners, the applicability of those alleged penalties would have to be determined at that source partnership level pursuant to section 6221. See also sec. 6226(f) (granting a reviewing court in a TEFRA proceeding jurisdiction to "determine * * * the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item").

Section 301.6221-1(d), Proced. & Admin. Regs., states that partner-level defenses to any penalty or addition to tax, such as the reasonable cause exception of section 6664(c)(1) (in these cases, petitioner's claim that he reasonably relied on "supporting documentation"), "may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment." Section 301.6221-1(c), Proced. & Admin. Regs., also states that "[p]artner-level defenses to such items can only be asserted through refund actions following assessment and payment." See also sec. 6230(c)(1)(C), (4) (together providing that a partner may file a claim for refund asserting the Commissioner's improper imposition of any penalty or addition to tax at the partnership level, including the assertion of "any partner level defenses that may apply"); New Millennium Trading, LLC v. Commissioner, 131 T.C. 275, 284

[*27] (2008) ("When considering the determination of penalties at the partnership level, the Court can consider the defenses of the partnership but not partner-level defenses of individual partners.").  Courts have deemed it appropriate, however, under certain circumstances, to consider partner-level defenses to the imposition of penalties and additions to tax in the partnership-level proceeding.  See, e.g., Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121, 2009 WL 1475159, at *19 (partnership-level defenses "include all defenses that require factual findings that are generally relevant to all partners or a class of partners"); Santa Monica Pictures, LLC v. Commissioner, T.C. Memo. 2005-104, 2005 WL 1111792, at *94-*112; Klamath Strategic Inv. Fund, LLC v. United States, 472 F. Supp. 2d 885, 903-904 (E.D. Tex. 2007), aff'd, 568 F.3d 537 (5th Cir. 2009).  In any event, for reasons explained above, partner-level defenses to the imposition of the section 6662 accuracy-related penalty may not be tried in a partner-level proceeding before the application of that penalty to the partnership has been determined in a partnership-level proceeding.

E.    Disregarding a Partnership

Assuming the well operations did, in fact, create separate entities classified as partnerships for Federal income tax purposes, the determination of whether the partnerships should be disregarded for tax purposes under a legal doctrine such as

[*28] sham or economic substance is a partnership item. Petaluma FX Partners, LLC v. Commissioner, 131 T.C. 84, 93, 97 (2008), aff'd on this issue, 591 F.3d 649, 653-654 (D.C. Cir. 2010); see also RJT Invs. X v. Commissioner, 491 F.3d 732, 737-738 (8th Cir. 2007).

F.      Theft Loss Deduction

Likewise, petitioner's alternative claim--that because it was discovered in 2006 that the LLCs had invested in a Ponzi scheme, each LLC is entitled to a theft loss deduction for that year for its entire investment under section 165(e)-- involves a partnership item. In Marine v. Commissioner, 92 T.C. 958, 967-977 (1989), aff'd without published opinion, 921 F.2d 280 (9th Cir. 1991), a pre-TEFRA case, we stated that, when a general partner embezzles limited partners' cash contributions, he is not acting in this capacity as a partner, since he has no authority to steal. The partnership and not, directly, the individual partners, is able to deduct the theft loss as if a nonpartner had committed the embezzlement. Id. In Midcontinent Drilling Assocs. v. Commissioner, T.C. Memo. 1994-119, 1994 WL 91170, at *5, a TEFRA case, we stated (on the authority of Marine): "A partnership may be entitled to deduct an embezzlement loss." We found, however, that, although the parties had stipulated that the general partner had embezzled sums from the partnership, the partnership failed to prove sufficient details to

**[\*29]** justify its claimed theft loss. Implicit in our discussion is the assumption that the general partner's misappropriation of the limited partners' capital contributions was a partnership item. Were it not, we would have dismissed that portion of the petition for lack of jurisdiction.[5]

_____

[5]Respondent argues that, "should petitioner's Ponzi scheme allegations eventually be proved correct, then the Income Programs and the alleged source partnerships are not partnerships for federal income tax purposes." Respondent's argument about allegations that might eventually be proved correct is an argument that a genuine issue of material fact remains that should preclude a decision at this time. We reject that argument. We reopened the record and conducted the second trial so that the parties could introduce additional evidence as to whether the income programs constituted partnerships. Respondent has, thus, had adequate opportunity to present evidence of fraud and to argue (presumably) that fraud in the inducement to become partners negates the partnership. We have neither adequate evidence of fraud nor a fleshed-out argument on brief. The record is again closed, and we will decide the existence-of-a-partnership issue on the record and arguments in front of us.

In passing, we note that respondent's lawyers have, perhaps inconsistently, dealt with a similar argument administratively. In an IRS Field Service Advisory, 1997 WL 33314338 (June 3, 1997) (FSA), the Chief Counsel reconsidered a previous FSA, 1994 WL 1865988 (June 3, 1994). The two FSAs addressed procedures for resolving theft loss deductions claimed by victims of the Ponzi schemes perpetrated by the operators of TEFRA partnerships. In the first FSA, the Chief Counsel's National Office took the position that the TEFRA partnership provisions would govern the theft losses only if the partnership entities directly incurred the losses (which would be passed through to the partners under the provisions of subch. K (the partnership provisions of the Internal Revenue Code)). If, on the other hand, the individual investors were defrauded into investing in the partnerships, the FSA held, the TEFRA procedures would not apply. Whether the general partners had, in fact, participated in the fraud by inducing innocent partners to invest in the "sham" partnerships had not been determined, and the

(continued...)

**[\*30]** II.    Analysis

    A.    <u>Whether Well Operations Created Entities Classified as Partnerships</u>

       1.    <u>Introduction</u>

Whether we are precluded from deciding the substantive issues in these consolidated cases and, therefore, must dismiss the cases for lack of jurisdiction depends on whether for Federal tax purposes the well operations created entities separate from the coowners (including LLCs) of the working interests.  If they did, and the entities are properly classified as partnerships, then the substantive issues involve partnership items or affected items, and all partnership items (including whether the partnerships are to be disregarded, e.g., as shams or for lack of

_____

      [5](...continued)
issue in the second FSA was whether the IRS must issue protective statutory notices of deficiency for deficiencies attributable to theft losses claimed by TEFRA partners on their own returns.  The second FSA concluded that the IRS need not issue the protective statutory notices "because, irrespective of whether the general partner participated in the fraud, the resulting loss is either a partnership item or an affected item and is thus properly determinable at the partnership level."  The second FSA relies principally on <u>Marine v. Commissioner</u>, 92 T.C. 958, 967-977 (1989), <u>aff'd without published opinion</u>, 921 F.2d 280 (9th Cir. 1991), and <u>Midcontinent Drilling Assocs. v. Commissioner</u>, T.C. Memo. 1994-119, in reaching that result.  The second FSA appears to contradict respondent's position here that, if the Ponzi scheme allegations prove correct (which has not yet been determined), there are no partnerships.  Respondent does not in his argument here address the question of "as of when" there would be no partnerships:  ab initio or when the Ponzi scheme was discovered or proved.  <u>Cf.</u> sec. 165(e).

**[*31]** economic substance) must be determined first in a partnership-level proceeding, before the consequences of any partnership-level determinations may be applied to the LLCs (i.e., to the partners). It is true that, had someone at or acting on behalf of Energytec determined that the well operations did create partnerships for its many joint drilling ventures (including those to which the LLCs were parties) and, on account of that determination, did file partnership returns on behalf of those relationships, then the question of whether the well operations did, in fact, give rise to partnerships for Federal income tax purposes would appropriately be determined in partnership-level proceedings directed at the putative partnerships. See sec. 6233(a); sec. 301.6233-1(a), Proced. & Admin. Regs. There are, however, no partnership returns for such putative partnerships (nor any FPAAs), and we must make that determination in this non-partnership-level proceeding. See Alhouse v. Commissioner, T.C. Memo. 1991-652 ("Since no partnership return was filed and no notice of final partnership administrative adjustment (FPAA) issued, if we find that a partnership existed we must dismiss for lack of jurisdiction insofar as the individual notices of deficiency pertain to partnership items or (affected items).").

**[*32]**     2.     <u>Respondent's Argument</u>

In his opening brief, respondent argues:

> Thus, for 2004 and 2005, while Jimastowlo and Oil Coming nominally held working interests, received cash payments, and claimed expenses, the whole arrangement lacked any real economic connection to an actual business enterprise.  The cash payments were unrelated to production, and the expenses claimed were unrelated to operations.  * * *  [W]hile the arrangements between Jimastowlo, Oil Coming, and Energytec nominally involved joint ownership of working interests, in substance there was never a coming together to share profits and losses.

We understand respondent's argument to be that, notwithstanding that each LLC was among the coowners of a working interest that entitled those coowners to explore for and extract oil and gas, in neither case did the coowners actually join together to exploit their rights, and, therefore, their status as coowners was insufficient to create an entity (a business entity) classified as a partnership for Federal tax purposes.  We disagree that the coowners did not actually join together to exploit their rights, and we further disagree that they failed to create an entity classified as a partnership.  Our reasons follow.

    3.     <u>Coowners of a Working Interest</u>

Consistent with the dictionary definition of a working interest quoted <u>supra</u> note 3, we have said:  "Generally, * * * a working interest in an oil field is a leasehold interest granted by the fee simple owner of the land to explore for and

**[*33]** extract oil from the land." Cokes v. Commissioner, 91 T.C. 222, 223 (1988). Energytec had working interests in the Schuyler and Milstead leaseholds, and it assigned 7.93% interests in those working interests to the LLCs. Respondent argues that the assignment to Jimastowlo was not valid until recorded in 2006 and that the assignment to Oil Coming was not valid since never recorded. Respondent overstates the case. There were written assignments of percentage working interests to the LLCs, executed by an officer of Energytec, which, even though unrecorded, were valid, under Texas law, as between the LLCs and Energytec. See Tex. Bus. & Com. Code Ann. sec. 26.01 (West 2009); Tex. Prop. Code Ann. sec. 13.001(b) (West 2004). Each LLC was, thus, a cotenant (i.e., coowner) with Energytec (and others) of the respective leasehold. See Glover v. Union Pac. R.R. Co., 187 S.W.3d 201, 213 (Tex. App. 2006) ("Owners of undivided portions of oil and gas interests are tenants in common.").[6]

---

[6]Respondent also agues that, because the assignments were not executed until 2005, then, even if valid under Texas law, they could not have been effective for 2004. As noted supra, however, each assignment stated that it was "to be effective" as of 2004, and evidence in the record indicates that the LLCs invested in the drilling programs and at least Oil Coming began receiving distributions in 2004. Evidence of 2004 investments by both Jimastowlo and Oil Coming is also furnished by Energytec's 2004 return, which reports gross receipts of over $16 million attributable to "Disposition of various working interests". No amount is so denominated on either its 2005 or 2006 return. We find on those facts that the LLCs effectively received their percentage working interests in 2004.

**[\*34]**        4.        <u>Carrying On a Trade or Business Cooperatively</u>

Mere coownership of property, even if it is maintained, kept in repair, and rented or leased, does not constitute an entity separate from the coowners for tax purposes.  <u>See</u> sec. 301.7701-1(a)(2), Proced. & Admin. Regs.  Nevertheless, as stated <u>supra</u>:  "A joint venture or other contractual arrangement may create a separate entity for federal tax purposes <u>if</u> the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom."  <u>Id.</u> (emphasis added).

During the audit years, Energytec operated the wells on the Schuyler and Milstead leaseholds, and, while both production and sales of oil were minimal, there were both production and sales.  Indeed, during the second trial, one of respondent's counsels conceded that, during the audit years, there was a business in existence with respect to each of the Schuyler and Milstead leaseholds:  a "business consisting of drilling for oil and selling it".  Counsel added:  "Energytec owned the business or was conducting the operations of the business activity."  Counsel's statements about the existence of businesses with respect to each leasehold are consistent with our findings.  The business in question was exploiting the rights coowned by the working interest owners (including the LLCs) to explore for and extract oil from each leasehold.  During the years,

**[*35]** Energytec did not itself directly operate the wells on the Schuyler and Milstead leaseholds. It employed first Cole Engineering and then Commanche to do so. We have found that, during those years, each collected oil from the wells in tanks, sold the collected oil, offset operating expenses against sale proceeds, and apportioned what proceeds remained among the working interest owners in proportion to their percentage interests. We have further found that no working interest owner could take in kind or sell on its own its share of any oil production. We have not made those findings primarily on the basis of the evaluation reports or other documents in evidence, but we have made them primarily on the basis of testimony of respondent's witness, Paul Willingham, who, beginning in Spring 2005, was, first, employed by Energytec as controller and, then, as vice president/controller. He was a credible witness, familiar with Energytec's operating procedures. He testified that the oil produced in connection with any one of Energytec's drilling programs "went into a tank and it was sold as a load and then, once the revenue came in, it would be distributed amongst whoever was the owner based upon its ownership percentage." He testified that neither LLC could take its share of the oil in kind.

Mr. Willingham's description of the drilling, sales, and apportionment-of-proceeds process is indicative that Energytec operated the wells on the Schuyler

[*36] and Milstead leaseholds on a cooperative basis for the working interest owners, and, indeed, we have so found. In so finding, we recognize that, during the audit years, no written joint operating agreement governed operation of the wells on either the Schuyler or the Milstead leasehold. That Energytec would operate the wells on a cooperative basis without a written joint operating agreement was, however, prefigured by the evaluation reports, which the LLCs had received before receiving assignments of their percentage working interests. The reports describe Energytec as operating the wells on the leaseholds; they state that Energytec is offering to sell programs consisting of 7.93% working interests in the wells, and they project the monthly net return to each program. It is implicit in the evaluation reports that Energytec would, directly or indirectly, operate the wells and share the net proceeds proportionately among the working interest owners.

That Jimastowlo understood that it was in a cooperative relationship as regards the Schuyler lease drilling program was certainly the understanding of another of respondent's witnesses, Steven D. White, petitioner's predecessor as tax matters partner for Jimastowlo. When asked by respondent's counsel about his decision to "invest in * * * Income Program 105", Mr. White responded: "I would say I didn't invest. I became partners with them [Energytec]." Mr. White further

[*37] testified that he came away from a meeting with an Energytec representative with the understanding that Jimastowlo would be participating in a partnership in that it would be "owning part of a well that other people would have shares in. The oil would be produced, and I would get my allotted I guess return back." On the basis of the testimony of Messrs. Willingham and White, we think that Energytec may accurately be described as the common agent of the coowners of each working interest for the purpose of exploiting the appurtenant leasehold.

Although it is true that, until March 2006, the LLCs received fixed payments in excess of their shares of actual net revenues from production, in May 2006 Energytec initiated the originally intended arrangement by requiring each LLC's future share of actual net revenue from production to offset the excess portion of what Energytec has been treating as prior advance payments based upon projected net revenue. Moreover, as Mr. Willingham testified, the coowners (including the LLCs) were credited with their shares of whatever net income the wells did produce. Jimastowlo's net revenue from its share of the working interest in the Schuyler leasehold as of March 31, 2006, was minimal: gross revenue of $2,549, actual expenses of $1,565, net revenue of $984. Oil Coming fared somewhat better as of that date from its share of the working interest in the Milstead leasehold: gross revenue of $26,762, actual expenses of $6,762, and net

[*38] revenue of $20,000. After March 2006, when Energytec ceased making payments to the LLCs based on projected net income, and through November 2009, there was no net revenue from production associated with the Schuyler leasehold wells, and Jimastowlo was credited with none. On the other hand, through that period Oil Coming was credited with $13,031, its pro rata share of net revenue from production associated with the Milstead leasehold wells. Thus, while it is undoubtedly true that, at least in major portion, the cash payments that the LLCs received were unrelated to production, and while it may be true (we have no evidence) that an equally major portion of the claimed expenses was unrelated to operations, it is nonetheless true that, during the audit years, each of the LLCs was the owner of 7.93% of a working interest in oil and gas wells that were producing at least minimal amounts of oil in which each owned a share. Moreover, the evidence indicates that Energytec intended the fixed payments to be reflective of actual, anticipated well production. As noted supra, however, because the revenue and profit projections upon which those payments were based proved to be overly optimistic, it was necessary to stop payments in March 2006 and attempt to carry out the original intent to have the coowners receive no more than their pro rata shares of the actual profits from well production.

**[*39]** The LLCs were, thus, because of their coownership of working interests in the Schuyler and Milstead leaseholds, and by virtue of the common agency of Energytec, participants in "actual" oil drilling and sales businesses. Those actual oil drilling and sales businesses undoubtedly incurred expenses and other deductible items, and, because, as stated in the evaluation reports, each working interest owner's share of drilling proceeds was only net of its share of expenses, each LLC's share of proceeds was burdened by its share of those expenses (notwithstanding that, at least initially, distributions did not reflect those net shares). Each LLC claimed deductions for what it says is its share of those items, which respondent disallowed and which are at issue in these cases (e.g., "oil & gas expenses-IDC", "oil depletion exp", "oil & gas production expenses", "qual production activities"). Respondent's argument, set forth above, that the LLC's "lacked any real economic connection to an actual business enterprise" is that "[t]he cash payments were unrelated to production, and the expenses claimed were unrelated to operations." That argument ignores the testimony of respondent's witness (Mr. Willingham) about the actual functioning of well operations. It also ignores the fact that fixed payments stopped in May 2006 in favor of a "truing up" consistent with a characterization of the prior cash payments as advance payments against actual revenues. Indeed, respondent concedes on brief that the LLCs

[*40] "nominally held working interests".  Moreover, by the FPAA in Jimastowlo's case and by the answer in Oil Coming's case, respondent would limit to passive loss status any losses resulting from the LLCs' deductions <u>not because</u> the losses <u>did not</u> result from working interests in an oil and gas property, <u>but</u> <u>because</u> the losses <u>did</u> result from working interests, which were held through the LLCs.  <u>See</u> sec. 469(c)(3).

Each LLC was, thus, a coowner with Energytec (and others) of a working interest in an oil and gas leasehold, which working interest entitled the coowners thereof to find and extract oil and gas.  To exploit the working interest, the coowners had to cooperate.  During the audit years, Energytec, acting as common agent, operated the wells on a cooperative basis for the working interest owners.  No working interest owner could take his share of production in kind or sell it independently of the other owners.  The coowners were not merely sharing expenses.  They were jointly carrying on a trade or business and dividing the proceeds therefrom.

### 5.    Classification for Tax Purposes

Because the coowners of the working interests in each of the Schuyler and Milstead leaseholds jointly carried on a trade or business, dividing the proceeds therefrom among themselves, each trade or business constituted for Federal tax

[*41] purposes an entity separate from the coowners of the appurtenant working interest. See sec. 301.7701-1(a)(2), Proced. & Admin. Regs. There being no argument that the resulting entity should be classified as a trust (or otherwise specially classified), the entity is within the meaning of the regulations a business entity, classified as either a partnership or a corporation. See sec. 301.7701-2(a), Proced. & Admin. Regs. Since it is a domestic business entity with more than two members that is not a per se corporation (and not electing to be classified as a corporation), it is, by default, classified as a partnership. See sec. 301.7701-3(a) and (b)(1), Proced. & Admin. Regs.

We need not at this time get into an extended discussion of whether promulgation of the so-called check-a-box regulations, sections 301.7701-1, 301.7701-2, and 301.7701-3, Proced. & Admin. Regs., effective in 1997, can be reconciled with the prior caselaw defining partnerships, since we see no conflict in these cases. Our conclusion that the coowners of each working interest were jointly carrying on a trade or business and dividing the proceeds therefrom would be sufficient to satisfy the multifactor test for determining partnership classification that we emphasized in Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964), and subsequent cases. E.g., Superior Trading, LLC v. Commissioner, T.C. Memo. 2012-110, 2012 WL 1319748, at *4 n.9 ("The import

**[\*42]** of these so-called <u>Luna</u> factors has not dissipated any after the promulgation of sec. 301.7701-3(a), Proced. & Admin. Regs."); <u>WB Acquisition, Inc. v. Commissioner</u>, T.C. Memo. 2011-36, 2011 WL 477697, at \*9; <u>Comtek Expositions, Inc. v. Commissioner</u>, T.C. Memo. 2003-135, 2003 WL 21078102, at \*6, <u>aff'd</u>, 99 Fed. Appx. 343 (2d Cir. 2004); <u>Alhouse v. Commissioner</u>, T.C. Memo. 1991-652.

We also note that the question of whether the joint exploitation of a working interest in an oil and gas leasehold creates an entity has a long, contentious history, culminating in a series of cases that conclude that working interest owners and well operators create a pool or joint venture for operation of the wells. In <u>Bentex Oil Corp. v. Commissioner</u>, 20 T.C. 565 (1953), the taxpayer (Bentex) had joined with two other coowners of an oil and gas leasehold to exploit it. They operated under an oral agreement providing that each coowner would separately take and sell his share of the lease production. The operation, identifying itself as a joint venture, filed partnership returns for 1937 through 1939, in which it elected to expense, rather than capitalize, intangible drilling costs. Later, because it was to its advantage, Bentex attempted to disavow the IDC election made by the organization, arguing that the organization was not a partnership or a joint venture and had no right to make the election. We summarily dispensed with that

**[*43]** argument, stating that, on the facts before us, "we entertain no doubt" that the organization "was a joint venture or partnership within the broad definition of that term in * * * [what is now section 7701(a)(2)]".  And while it may be that the underlying rationale for our conclusion was that, because the organization filed a partnership return, the members were estopped from denying partnership status, in Cokes v. Commissioner, 91 T.C. at 230, without any mention of the partnership return, we said:

> In 1953, in a unanimous Court-reviewed opinion, we held that a taxpayer who held a one-quarter interest in an oil and gas lease was a participant in a partnership or joint venture, and so an election to currently deduct or to capitalize certain expenditures could be made only by the partnership or joint venture, and could not be made separately by the taxpayer.  Bentex Oil Corp. v. Commissioner, 20 T.C. 565 (1953).

In Perry v. Commissioner, T.C. Memo. 1994-215, involving self-employment tax, the taxpayer owned percentage working interests in numerous wells under agreements providing that, in proportion to their respective percentage interests, the working interest owners owned the oil and gas produced by the wells and the equipment and the materials to operate the wells.  The taxpayer's liability for self-employment tax turned on whether he was a member of a partnership carrying on a trade or business.  There was no partnership agreement, although the taxpayer's percentage working interests in each well were subject to a standard form

[*44] operating agreement. Relying on Bentex and Cokes, we concluded: "[T]he working interest owners and well operators created a pool or joint venture for operation of the wells. Accordingly, petitioner's income from the working interests was income from a partnership of which he was a member, under the broad definition of 'partnership' found in section 7701(a)(2)."

There were here no written partnership agreements among the coowners of the working interests in either the Schuyler or the Milstead leasehold, nor had the coowners executed joint operating agreements. Nevertheless, during the audit years Energytec operated the wells on both leaseholds on a cooperative basis for benefit of the working interest owners. The working interest coowners and Energytec (in its role as common agent for the coowners) thereby created pools or joint ventures (without distinction, joint ventures) for operation of the wells that would, on the authority of cases particular to the classification of arrangements for the exploitation of working interests in oil and gas properties, like Bentex, Cokes, and Perry, be classified as partnerships for Federal tax purposes.

6.    Conclusion

To summarize: Jimastowlo and Oil Coming were partial owners of working interests in the Schuyler and Milstead leaseholds; the well operations (carried out by Energytec on those leaseholds for the benefit of the owners of the working

[*45] interests) created separate entities (joint ventures) classified as partnerships for Federal tax purposes, and, by virtue of their shares of the working interests, the LLCs were members of those joint ventures (i.e., partners in partnerships). Respondent may still argue that, for lack of economic substance or on account of some other antiabuse doctrine, the classification of those joint ventures as partnerships must be disregarded. We do not, and may not, under RJT Invs. X v. Commissioner, 491 F.3d at 737-738, and Petaluma FX Partners, LLC v. Commissioner, 131 T.C. 84, address that issue in this partner-level proceeding. Respondent must make that argument in proceedings against the two drilling program partnerships.

B.     Application of Section 6231(g)(1)

Section 6231(g)(1) provides in its entirety:

> SEC. 6231(g). Partnership Return to be Determinative of Whether Subchapter Applies.--
>
> (1) Determination that subchapter applies.--If, on the basis of a partnership return for a taxable year, the Secretary reasonably determines that this subchapter applies to such partnership for such year but such determination is erroneous, then the provisions of this subchapter are hereby extended to such partnership (and its items) for such taxable year and to partners of such partnership.

**[*46]** Respondent, citing the lack of any reference to or indicium of a joint venture in the LLCs' and Energytec's returns (and the effective denial, in those returns, that such partnerships existed), argues that he "reasonably relied on the Forms 1065 filed by * * * [the LLCs] in determining that the TEFRA partnership provisions applied only at their level and not to any alleged source partnerships." Respondent's reliance on section 6231(g)(1) is misplaced.

Section 6231(g)(1) was added to the TEFRA partnership provisions by the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 1232(a), 111 Stat. at 1023. Both the statutory language and the House Ways and Means Committee Report[7] make clear that the intent of the provision was to alleviate the Commissioner's difficulties in determining "whether to follow the TEFRA partnership procedures or the regular deficiency procedures", a problem generally caused by the inability to ascertain with certainty whether the partnership in question had 10 or fewer partners and, therefore, was a "small partnership" exempt from the TEFRA partnership provisions. See H.R. Rept. No. 105-148 (1997), 1997-4 C.B. (Vol. 1) 319, 909-910. That is not respondent's problem in these consolidated cases, as it is undisputed that the TEFRA partnership provisions apply to the LLCs, i.e., that

---

[7]The provision originated in the House and was adopted, verbatim, by the Senate and the House-Senate conference committee.

[*47] respondent properly issued FPAAs to the LLCs, which, pursuant to section 301.7701-2(c)(1), Proced. & Admin. Regs., are taxable as partnerships. Respondent's problem is that all of the adjustments in those FPAAs represent flow-through items from source partnerships over which we lack jurisdiction in what would then be a partner-level proceeding. See Rawls Trading, L.P. v. Commissioner, 138 T.C. at 288-289; Sente Inv. Club P'ship of Utah v. Commissioner, 95 T.C. at 248.

C.    Respondent's Authority To Issue FPAAs to the Joint Ventures

Respondent argues that, even though the ostensible joint ventures' failures to file partnership returns permit respondent to assess tax liabilities against their partners (and, therefore, to issue FPAAs to the ostensible drilling program partnerships) "at any time", see sec. 6229(c)(3), as a practical matter, the issuance of FPAAs to the joint ventures would be impossible. In reaching that conclusion, respondent points to the absence of (1) joint venture returns resulting in the failure to identify a tax matters partner, as defined in section 6231(a)(7), or, indeed, any of the partners, and (2) information "as to the name, EIN, address, or principal place of business of either alleged source partnership." Respondent also posits that, if he issues FPAAs to the LLCs as partners in the alleged source partnerships, the legitimacy of those FPAAs "more than likely * * * will be contested in this

[*48] Court."  Respondent also fears that the issuance of "additional FPAAs to any alleged source partnerships * * * could expose respondent to a charge that * * * [they] are * * * arbitrary and capricious and thus invalid", citing Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), rev'g 81 T.C. 855 (1983).

Like all courts, we are a court of limited jurisdiction.  As we stated in Rawls Trading, L.P. v. Commissioner, 138 T.C. at 292, "in determining the outer limits of the ambit of our subject matter jurisdiction, we cannot consider the consequences, howsoever harsh they may be, that our decision inflicts upon one of the parties."  Moreover, as in that case, we believe respondent's concerns are overblown.  There are exhibits in the record identifying the coowners of both the Schuyler and Milstead leaseholds and enough evidence of joint ventures to preclude a successful argument that the FPAAs should be considered arbitrary and capricious and, therefore, invalid under Scar.  We also note that, pursuant to section 6231(a)(7) and section 301.6231(a)(7)-1(p) and (q), Proced. & Admin. Regs., respondent may be able to select as the tax matters partner any one of a number of working interest owners, including Mr. Petito on behalf of each of the joint-venturer LLCs, for purposes of serving the FPAAs.

**[*49]** D. <u>Application of Section 6222</u>

We have also considered, on our own motion, the possible application of section 6222, which requires consistency between how a partner treats a partnership item on his return and how the partnership treats it on its return. <u>See</u> sec. 6222(a). The consequence of any inconsistency between how a partner treats a partnership item on his return and how the partnership treats it on its return is that, unless the partner notifies the Secretary of the inconsistency, section 6225, which requires a partnership-level proceeding before assessment of a deficiency, does not apply to computational adjustments necessary to bring the partner's treatment of the partnership items on his return into consistency with the partnership's treatment of the items on its returns. <u>See</u> secs. 6222(c), 6225. The LLCs did not notify the Secretary of any inconsistencies with the joint ventures, so that there is at least the potential for respondent, on the authority of section 6222(c), to bypass section 6225 and to immediately assess deficiencies in tax resulting from computational adjustments necessary to bring consistency.

Respondent's authority to bypass partnership-level proceedings against the joint ventures and to make immediate assessments attributable to computational adjustments at the LLC (partner) level is limited to the circumstances described in section 6222(b)(1)(A)(i), i.e., where "the partnership has filed a return but the

[*50] partner's treatment * * * [of a partnership item] is * * * inconsistent with the [partnership's] treatment of the item", and the partner has failed to notify the Commissioner of the inconsistency. See sec. 6222(c). As one commentator has suggested, that authority does not exist in the case of a partner's failure to file a notice of inconsistent treatment arising (under section 6222(b)(1)(A)(ii)) solely from the partnership's failure to file a return. Steven R. Mather, Audit Procedures for Pass-Through Entities, 624-2d Tax Management (BNA) at A-29 ("[T]here is no apparent consequence within the scope of the TEFRA provisions for an inconsistency arising from the failure of the partnership to file a partnership return.")[8]

We find section 6222 to be inapplicable herein.

III.    Conclusion

The joint ventures of which each of the LLCs was a member were partnerships required to file partnership returns and, thus, subject to the TEFRA partnership provisions. The substantive issues all involve partnership items of the

---

[8]Sec. 6222(b) clearly contemplates a partner's filing a notice of inconsistency with respect to any partnership item if the partnership has not filed a return. See sec. 6222(b)(1)(A)(ii). Since the partnership may file a delinquent return after the partner has filed his return, a partner filing a notice of inconsistency will in that case be excused from the consistency requirement pursuant to sec. 6222(b)(1), flush language ("subsection (a) shall not apply to such item").

[*51] joint ventures.  The LLCs were pass-thru partners and, with respect to them, the substantive issues all involve what would be computational adjustments if the substantive issues (partnership items) were decided adversely to the joint ventures. See sec. 6231(a)(6); Rawls Trading, L.P. v. Commissioner, 138 T.C. at 285; Sente Inv. Club P'ship of Utah v. Commissioner, 95 T.C. at 248.  The fact that the joint ventures failed to file partnership returns and that the Commissioner has neither initiated nor completed partnership proceedings does not change that analysis. See Alhouse v. Commissioner, T.C. Memo. 1991-652.  The FPAAs issued to Jimastowlo and Oil Coming appear to reflect only computational adjustments.[9]  If that is true, the FPAAs are invalid and do not confer jurisdiction on us.  Rawls Trading, L.P. v. Commissioner, 138 T.C. at 289.  We will confer with the parties to determine whether there are any issues (other than computational adjustments) properly addressed in this proceeding.  We must dismiss for lack of jurisdiction insofar as the individual FPAAs pertain to computational items.

To reflect the foregoing,

An appropriate order will be issued.

---

[9]There are other items on some of the FPAAs respondent issued with respect to the LLCs.  Those items make no adjustments to the LLCs' returns.  Thus, eliminating the adjustments that appear to be computational adjustments, the FPAAs appear to make no changes to the LLCs' returns.